1
2
3                    UNITED STATES  DISTRICT COURT
4                      Northern District of California
5
6    FAITH MUNN,
7                          Plaintiff,              No. C 08-1942 VRW (MEJ)
           v.
8                                                  **REPORT AND RECOMMENDATION
     HERTZ LONG-TERM DISABILITY PLAN,              RE: ALL OUTSTANDING MATTERS**
9
                         Defendant,
10   _____/
11   LIFE INSURANCE COMPANY OF NORTH
     AMERICA,
12
                         Real Party in Interest.
13   _____/
14                          **I.  INTRODUCTION**
15          This matter has been referred to the undersigned for a report and recommendation on "all
16   outstanding matters."  (Dkt. #74.)  Pending before the Court are the following five matters: (1)
17   Defendant The Hertz Corporation Long-Term Disability Plan ("the Plan") and Real Party in Interest
18   Life Insurance Company of North America's ("LINA") (collectively "Defendants") motion to strike
19   portions of Plaintiff Faith Munn's ("Plaintiff") complaint for breach of fiduciary duty (Dkt. #28); (2)
20   Defendants' motion for judgment or alternatively, for summary judgment  (Dkt. #40); (3) Plaintiff's
21   cross-motion for judgment (Dkt. #43); (4) Plaintiff's supplemental memorandum regarding LINA's
22   structural conflict of interest (Dkt. #58); and (5) Plaintiff's motion for judgment on her breach of
23   fiduciary duty claim (Dkt. #77).  After consideration of the parties' papers and oral arguments,
24   relevant legal authority, and good cause appearing, the undersigned RECOMMENDS as follows.
25                        **II.  FACTUAL BACKGROUND**
26   **A.      The LINA Group Policy of Disability Insurance**
27          The Hertz Corporation ("Hertz") is a subscriber to a LINA group policy of disability
28   insurance ("the Policy"), which was effective July 1, 2004.  (Hong Decl., Ex. A 105-127, Dkt. #41-

2.)[1]  The Policy provided disability insurance coverage to employees of Hertz who were eligible. (LINA 105, 107, 124.)

Under the Policy, an employee is considered disabled if, due solely to injury or sickness, "he or she is:  (1) unable to perform the material duties of his or her Regular Occupation[2]; and (2) unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation." (LINA 108.)  "Regular Occupation" is defined as the occupation that the employee was routinely performing at the time the disability began.  (LINA 126.)  When "evaluating the Disability, the Insurance Company will consider the duties of the occupation as it is normally performed in the general labor market in the national economy.  It is not work tasks that are performed for a specific employer or at a specific location."  *Id.*

The Elimination Period under the Policy is 26 weeks, formerly 180 days.  (AR 68; LINA 109.)  "The Elimination Period is the period of time an Employee must be continuously Disabled before Disability Benefits are payable."  (LINA 115.)  "A period of Disability is not continuous if separate periods of Disability result from unrelated causes."  *Id.*  The Policy states that LINA will pay an employee's disability benefits if the employee becomes disabled while covered under the Policy.  *Id.*  The requirements are that the employee "must satisfy the Elimination Period, be under the Appropriate Care[3] of a Physician, and meet all the other terms and conditions of the Policy."  *Id.*  Additionally, the employee must provide LINA, "at his or her own expense, satisfactory proof of

---

[1]Exhibit A to the Hong Declaration comprises pages 105-127 of the Administrative Record ("AR") in this matter.  Exhibit A is comprised of the Policy and has been attached separate from the rest of the Administrative Record.  All citations to Exhibit A hereinafter will be to "LINA".  All citations to Exhibit B to the Hong Declaration, the rest of the Administrative Record, will be to "AR".

[2]Also referred to as Plaintiff's "own occupation" in the Administrative Record and throughout the Report and Recommendation.

[3]Defined as "the determination of an accurate and medically supported diagnosis of the Employee's Disability by a Physician, or a plan established by a Physician of ongoing medical treatment and care of the Disability that conforms to generally accepted medical standards, including frequency of treatment and care."  (LINA 124.)

2

UNITED STATES DISTRICT COURT
For the Northern District of California

Disability before benefits will be paid." *Id.*  For benefits to continue, LINA requires continued proof of disability. *Id.*

An employee's coverage under the Policy ends on the day when the employee is no longer in Active Service[4]. (LINA 112.)  When the Policy terminates, if the employee remains disabled and is eligible under the Policy, "Disability Benefits will be payable to an Employee who is entitled to receive [them]." *Id.*  However, "[n]o Disability Benefits will be paid, and insurance will end[,] if [LINA] determines the Employee is able to work under a modified work arrangement and he or she refuses to do so without Good Cause[5]."  (LINA 110.)

**B.      Plaintiff's Claim for Long-Term Disability ("LTD") Benefits**

1.      Plaintiff's Initial Claim

Plaintiff is a 65-year-old woman with a Masters Degree in Business.  (AR 141, 344.)  Plaintiff began working for Hertz in 1988 and, in May 2006, she was employed as a senior station manager.  (AR 46; Defs.' Mot. 2:6, Dkt. #40.)  Her occupation, considered by LINA to be a "light duty occupation," consisted of staffing, scheduling, renting, customer relations, and "all necessary to achieve operational efficiency."  (AR 165, 344; Defs.' Mot. 2:7, Dkt. #40.)  One of Plaintiff's minor duties was preparing reports.  (AR 344.)  Plaintiff's last day working at Hertz was May 20, 2006[6], and based on that date, the 26 week Elimination Period[7] mandated that Plaintiff be continuously disabled through November 18, 2006.  (AR 165.)  Were Plaintiff able to prove that she remained

---

[4]An employee is in Active Service when he or she "is performing his or her regular occupation for the Employer on a full-time basis."  (LINA 124.)

[5]Defined as a "medical reason preventing participation in the Rehabilitation Plan.  Satisfactory proof of Good Cause must be provided to [LINA]."  (LINA 124.)

[6]Several times throughout the Administrative Record, Plaintiff's last day working for Hertz is referred to as May 22, 2006, rather than May 20, 2006.  (AR 25, 347; *see also* Defs.' Mot. 2:10-11, Dkt. #40.)  The disparity is not addressed by the parties and does not appear to impact the Elimination Period.

[7]Also referred to as the Benefit Waiting Period or BWP in the Administrative Record.  (LINA 165, 353.)

UNITED STATES DISTRICT COURT
For the Northern District of California

1    continuously disabled throughout the Elimination Period, benefits would begin the following day.

2    (AR 162-65; Defs.' Mot. 4:20-21, Dkt. #40.)

3         Plaintiff submitted a claim for benefits in November 2006, and LINA sent her a letter

4    acknowledging her claim on November 7, 2006.  (Defs.' Mot. 4:9, Dkt. #40; AR 363-64.)  The letter

5    informed Plaintiff that LINA required medical information regarding her diagnosis and functional

6    abilities, and that if it could not obtain the information on its own, that it was Plaintiff's

7    responsibility to provide LINA with the information required.  (AR 363-64.)  On November 13,

8    2006, Plaintiff submitted a written claim form describing her condition as "tendonitis left thumb.

9    Right foot pain toes moved on top of one toe.  Back pain."  (LINA 347-48.)  On the claim form,

10   Plaintiff described this "illness" as work related and stated that foot, hand and back pain prevented

11   her from working.  *Id.*

12        On her claim form, submitted November 17, 2006, Plaintiff stated that she could not work in

13   her own or in any occupation due to pain in her right foot caused by her toe problems, that she could

14   not stand or wear shoes for any extended period of time, that she had lower back pain, and pain in

15   her left hand and thumb.  (AR 341-42.)  Plaintiff claimed that the primary physical reason

16   preventing her from working was continued back pain, left hand pain, and that she could not stand or

17   walk for extended periods.  *Id.*  Plaintiff listed six physicians on her claim form: Dr. Mizock

18   (general practice); Dr. Chesley (urgent care); Dr. Baldwin (pain management); and three podiatrists,

19   Drs. Sinclair, Osborne, and Mohammed.  (AR 348.)

20        On November 29, 2006, LINA sent letters to Drs. Sinclair, Mizock, Chesley, and Baldwin

21   asking that they send LINA Plaintiff's medical records and provide the restrictions and limitations

22   that would prevent her from returning to work.  (AR 38-41, 272-75, 281-90, 297-300, 302-05.)  Each

23   doctor was provided with a Physical Ability Assessment ("PAA") form to complete.  (AR 272-75,

24   282-89, 297-300.)  The following day, LINA sent Plaintiff a letter stating that information was

25   needed from the above-mentioned doctors in order to make a decision regarding her claim for

26   benefits and also notifying Plaintiff that her treatment providers had been contacted.  (AR 337.)  The

27   letter further advised Plaintiff that if LINA did not receive the requested information by December

28

4

30, 2006, that a determination would be made based on the information already in Plaintiff's file. *Id.* On December 12, 2006, LINA sent a second request for information to Drs. Baldwin, Chesley, Mizock, and Sinclair. (AR 266, 306, 318-22.) On December 28, 2006, a third request for Plaintiff's records was sent to Drs. Mizcok, Chesley, and Baldwin. (AR 33, 271, 292-96, 301.)

On January 5, 2007, LINA received a completed and undated PAA form from Dr. Williams, one of Plaintiff's treating podiatrists. (AR 185-86, 263-64.) In the PAA form, Dr. Williams stated that Plaintiff could tolerate sitting and standing continuously for five and a half hours or more throughout the work day. (AR 263.) Dr. Williams also found that Plaintiff's condition allowed her to climb stairs frequently and climb ladders occasionally throughout the work day. (AR 264.) LINA also received responses to the requests for information from Drs. Sinclair and Mizock, however they lacked "specific kaiser permanente authorization form[s] with specific reason for request . . . ." (AR 33-35.)

### 2.   Plaintiff's Medical Records During the Elimination Period

The Elimination Period, as discussed above, is the 26 week period during which Plaintiff must prove continuous disability under the Policy in order to qualify for LTD benefits. (LINA 115.) Plaintiff alleges that she was unable to work as of May 22, 2006, and thus is required to prove continuous disability through November 18, 2006. (AR 165.)

On May 23, 2006, Plaintiff saw Dr. Sinclair for pain in her right foot. (AR 214.) Dr. Sinclair's notes state that Plaintiff had pain at the touch of her right foot, that she had no signs of infection, no swelling and no redness, and that she should not wear tight shoes. (AR 214.) Dr. Sinclair ordered Plaintiff a custom made orthotic, told her to wear shoes with low heels and soft soles, and placed her off work for one week. *Id.*

On May 30, 2006, Plaintiff saw Dr. Mizock for left wrist pain. (AR 213.) Dr. Mizock noted that Plaintiff had pain when she gripped or moved her thumb against resistance, diagnosed Plaintiff with DeQuervain's tenosvovitis, and recommended ice, rest, and anti-inflammatory medication. *Id.* Dr. Mizock further noted that Plaintiff should consider a splint or steroid injection if the pain was not improved with conservative measures, or should her symptoms become disabling. *Id.*

On June 5, 2006, Plaintiff again saw Dr. Sinclair.  At that visit, Dr. Sinclair reduced the callus on Plaintiff's fourth toe that was causing her pain, told her to "use [her] post op shoe for another week" and placed her off work for a week.  (AR 212.)

On June 12, 2006, Plaintiff again saw Dr. Mizock for her left wrist pain.  Dr. Mizock noted that Plaintiff had been using the splint for her thumb, icing, resting, and taking anti-inflammatory medication with little improvement.  (AR 210.)  Plaintiff also informed Dr. Mizock of her right foot pain and that Dr. Sinclair was out of town.  *Id.*  Plaintiff requested a note for more time off work until she could get her wrist and foot pain under control.  *Id.*  Dr. Mizock gave Plaintiff a steroid injection for her wrist, and extended Plaintiff's time off work for ten days, until June 22, "so she [could] arrange to see podiatry and adequately rest her wrist."  (AR 211.)

On August 9, 2006, Plaintiff saw Dr. Mizock for follow-up on her wrist pain and to discuss her right foot problem.  (AR 198.)  Dr. Mizock noted that Plaintiff's wrist pain was improving with use of the splint and that her foot and toe numbness was improving with the use of shoes with a wide toe base, but that the shoes exacerbated her low back pain.  *Id.*  Plaintiff explained that she had been having low back pain intermittently for one month and was unsure whether the back and foot pain were related.  *Id.*  An examination of Plaintiff's back revealed that Plaintiff had "full range of motion, no tenderness, palpable spasm or pain on motion . . . ."  *Id.*  Dr. Mizock noted that Plaintiff had an abnormal right foot exam and ordered an MRI to determine whether the back pain was causing the foot pain.  (AR 199.)  Dr. Mizock also noted that Plaintiff requested work restrictions, but did not order Plaintiff off of work at that visit.  (AR 198.)

On August 17, 2006, Plaintiff saw Dr. Lai for the pain in her left thumb and wrist.  (AR 196.)  Dr. Lai noted that Plaintiff's exam revealed bliateral mild carpal tunnel syndrome but did not believe this to be the cause of Plaintiff's symptoms, and he recommended a neurological exam to determine if the cause of Plaintiff's pain was neurological.  *Id.*  Dr. Lai did not order Plaintiff off work or recommend work restrictions.

On September 7, 2006, Plaintiff saw Dr. Mizock to discuss her MRI results.  (AR 192.)  Dr. Mizock noted that the MRI revealed "essentially normal studies" and that she was undergoing

UNITED STATES DISTRICT COURT
For the Northern District of California

physical therapy for her back and occupational therapy for her wrist. *Id.* Dr. Mizock noted an abnormal exam of Plaintiff's wrist, but that Plaintiff felt it was improving, and extended Plaintiff's time off work until October 19, 2006, ostensibly for her wrist. *Id.* Dr. Mizock stated that Plaintiff could return to work on "at least modified duty" as of October 19, 2006. *Id.* Dr. Mizock's September 7, 2006 note did not mention Plaintiff's right foot pain.

On October 17, 2006, Dr. Mizock completed a form which stated that Plaintiff could return to work with modified duties on November 18, 2006, and without restrictions on February 19, 2007. (AR 254.) On the form, Dr. Mizock noted that Plaintiff was able to carry up to twenty-five pounds on occasion, bend, squat, kneel, climb, reach above her shoulders, and perform repetitive hand motions. *Id.* Dr. Mizock noted that Plaintiff could sit for a total of three hours throughout the eight hour work day, and that there were no restrictions as to driving. *Id.* Dr. Mizock concluded that Plaintiff's treatment plan would be physical and occupational therapy. *Id.*

Finally, on October 18, 2006, Plaintiff saw Dr. Rombakis for an eye exam, after which she was diagnosed with glaucoma. (AR 188.) Dr. Rombakis noted that Plaintiff would be retiring soon. (AR 189.)

### 3. Plaintiff's Medical Records After the Elimination Period

On November 21, 2006, Plaintiff saw Dr. Mizock to discuss her foot surgery options. (AR 187.) Dr. Mizock noted that Plaintiff wanted to go ahead with the surgery but that her podiatrist was out of the office until March 2007. *Id.* Dr. Mizock encouraged Plaintiff to go ahead with the surgery with another podiatrist. *Id.*

On December 11, 2006, Plaintiff saw Dr. Williams, a podiatrist. (AR 186.) Dr. Williams concluded that Plaintiff was a poor surgical candidate, that she was basically pain free in sandals, and that she "most likely needs to quit wearing shoes that are too small and rub on her toes. . . . she says that those aren't the cute kind." *Id.*

On January 17, 2007, Plaintiff saw Dr. Mizock about her right hand pain. (AR 183.) Dr. Mizock notes a "frank discussion with patient" regarding her return to work as scheduled in mid-February. *Id.* Dr. Mizock noted that Plaintiff was hesitant and was not even working modified duty

7

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

at the time of that visit.  *Id.*  Plaintiff told Dr. Mizock that she did not want to return to work until she can work twelve hours a day and six days a week as required by her job.  *Id.*  Dr. Mizock still recommended that Plaintiff return to work in mid-February.  *Id.*

On February 2, 2007, Plaintiff again saw Dr. Mizock, this time as an "urgent visit" so she could be referred back to podiatry to get her foot surgery.  (AR 182.)  Dr. Mizock noted that a referral would be sent to podiatry with an expedited surgery request.  *Id.*

On March 5, 2007, Plaintiff was seen by Dr. Warbritton, an orthopedic surgery specialist, who performed an Agreed Medical Examination as part of Plaintiff's worker's compensation claim.  (AR 141; Defs.' Mot. 10:5-6, Dkt. #40.)  Dr. Warbritton's exam and report focused on Plaintiff's back and extremities.  (AR 141.)  Dr. Warbritton noted that Plaintiff was "presently temporarily totally disabled" at the time of his exam.  (AR 142.)  He went on to note that it was "premature to render" a definitive opinion about Plaintiff's occupational status, but that she "may require the supplemental job displacement benefit."  (AR 143.)

As to the causation of Plaintiff's foot, back and hand symptoms, Dr. Warbritton maintained: "With regard to the right foot, it is my opinion that twenty-five percent of the permanent impairment that ultimately accrues will be the result of pre-existing nonindustrial medical conditions.  The remaining seventy-five percent of the permanent impairment will be the result of cumulative trauma continuing through May 20, 2006."  *Id.*  Dr. Warbritton's impression of Plaintiff's foot condition was "[h]allux valgus and metatarsus primus varus, right foot, pre-existing, aggravated by the subject cumulative trauma industrial injury described in this report . . . ."  (AR 154.)  The description of that condition can be summarized as a severe "crossed-toe" deformity.  (AR 152.)  Dr. Warbritton found that "[a]lthough the patient's underlying bunion is certainly partially nonindustrial, it is also related to cumulative trauma at the work place continuing through May 20, 2006."  (AR 155.)

As to Plaintiff's spine and wrist symptoms, Dr. Warbritton concluded that "one-hundred percent of the permanent impairment is not related to the patient's employment.  Accordingly, zero percent of the impairment is due to any specific or cumulative industrial events."  (AR 143.)  Dr. Warbritton notes that the onset of Plaintiff's back pain did not occur until she had already been

8

placed off work for her foot symptoms, and that "it is unlikely that the use of therapeutic footwear would cause the onset of spine symptoms."  (AR 144.)

In discussing his findings, Dr. Warbritton stated that he "would reject the assertion that the degenerative disease in [Plaintiff's] left hand is in any manner related to her employment.  It should be noted that [Plaintiff] did not perform repetitive manual activities or repetitive keyboard work with her left nondominant upper extremity . . . ."  (AR 154.)  He continued, "[t]herefore, there is insufficient evidence to support a cumulative trauma cause of action with regard to the left hand or upper extremities in this case."  Id.  Regarding Plaintiff's back symptoms, Dr. Warbritton stated in his report that he did not believe there had been compensable injury to Plaintiff's spine.  Id.  In his opinion, "[t]he patient exhibits evidence for some mild underlying degenerative disc disease with some vague pain that does not result in any ratable impairment, and does not result in the indications or necessity for medical treatment on an industrial basis."  (AR 154-55.)  "Accordingly, any impairment which may arise with regard to [Plaintiff's spine or hands] or need for medical treatment should be entirely self-procured and nonindustrial."  (AR 156.)

4.    The Denials of Plaintiff's Claim and Subsequent Appeals

On January 17, 2007, LINA determined that the medical records provided in support of Plaintiff's claim for LTD benefits, which, on January 17 consisted only of Dr. Williams' PAA form, did not support a finding of disability because Plaintiff could still perform the material duties of her own occupation.  (AR 31-32.)  That same day, LINA sent Plaintiff a letter informing her that her claim for benefits had been denied.  (AR 259-62.)  The letter explained that LINA had sent multiple requests to Plaintiff's treating physicians, Drs. Mizock, Baldwin, Chesley, and Sinclair, requesting copies of her office visit notes, imaging reports, diagnostic test results, restrictions and limitations, and that only Dr. Williams[8] had provided a response.  (AR 260.)  The letter provided that Plaintiff's

---

[8] Although the letter states that Dr. Sinclair provided a response, this appears to be an inadvertent error as it is actually from Dr. Williams.

9

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

claim was denied because based upon "the Material Duties of your Regular Occupation[9] we are unable to document any restrictions or limitations which prevent you from performing your duties as a Senior Station Manager."  (AR 261.)  Finally, the letter informed Plaintiff of her right to appeal. (AR 261-62.)

On March 2, 2007, Plaintiff appealed the denial of her claim.  (AR 256-57.)  In her letter, Plaintiff expressed her belief that the denial of benefits was incorrect, listed her official diagnosis as "hallux valgus (severe bunion and toe deformity), diabetes type II with peripheral neuropathy (nerve pain) and carpal tunnel in left hand[,]" and stated that she was slated for surgery for the hallux valgus condition in March.  (AR 257.)  Defendants state that additional medical records submitted by Plaintiff's doctors were considered as part of Plaintiff's appeal.  (Defs.' Mot. 6:14-15, Dkt. #40.) On March 9, 2007, a nurse case manager, Jeffrey Weber, performed a file review of the medical records submitted in support of Plaintiff's appeal, which comprise pages 177-250 of the Administrative Record.  (AR 26-27.)  Mr. Weber concluded that "a no work restriction would not be supported throughout [Plaintiff's] BWP" based on the exam findings.  (AR 27.)  A senior appeals specialist confirmed Weber's findings and agreed with the denial of Plaintiff's appeal.  (AR 23-24.)

On May 15[10], 2007, LINA sent Plaintiff a letter informing her that her appeal had been

---

[9]The letter informed Plaintiff that LINA would look at her occupation as defined by the US Department of Labor, rather than her specific job, to determine her disability status.  According to the dictionary of occupational titles ("DOT"), Plaintiff's occupation is considered light work, defined as: "Exerting up to 20 pounds of force occasionally, or up to 10 pounds of force frequently, or a negligible amount of force constantly to move objects.  Physical demand requirements are in excess of those for Sedentary Work.  Even thought [sic] the weight lifted may be only a negligible amount, a job should be rated Light Work:  (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing or pulling of arm or leg controls; or (3) when the job requires working at a production rate pace entailing the constant pushing or pulling of materials even though the weight of those materials is negligible.  NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even thought [sic] the amount of force exerted is negligible."  (AR 260.)

[10]The letter is dated April 12, 2007, however, according to LINA's records, it was not sent until May 15, 2007.  Thus, the undersigned will refer to the denial letter as the May 15 letter.

denied. (AR 24, 164-68.) The denial letter contains the Policy's definition of Disabled, the Elimination Period, and Plaintiff's own occupation, as did the initial denial letter. (AR 164-65.) The letter discussed the additional documentation provided on appeal: (1) two office notes provided by Dr. Sinclair, dated May 23, 2006 and June 5, 2006; (2) six office notes provided by Dr. Mizock, dated between June 12, 2006 and February 2, 2007; and (3) a copy of Plaintiff's cervical spine MRI taken on September 2, 2006. (AR 165-66.) Plaintiff was advised that LINA had reviewed the additional information provided and that the information did not support a no work restriction. (AR 167.) The letter continued, "[i]n determining your eligibility for Long Term Disability benefits we need medical documentation which supports a no work restriction. In reviewing the information provided, no restrictions regarding your functional ability were provided. Your physician noted that upon your request continuing extensions for time off work were provided." *Id.* Based upon this review, LINA "looked at the documented restriction and limitations provided, and your reported functional ability and the requirement of your occupation." *Id.* LINA informed Plaintiff that in comparing the duties of her Regular Occupation to the restrictions and limitations provided, they were "unable to document any restrictions or limitations which prevent [her] from performing [her] duties as a Senior Station Manager." *Id.* LINA concluded that Plaintiff was not entitled to benefits because the no work restriction was not supported by the documentation received. *Id.* LINA once again notified Plaintiff of her right to appeal. (AR 167-68.)

On July 25, 2007, Plaintiff appealed LINA's second denial of her claim. (AR 162-63.) Accompanying Plaintiff's appeal letter was the medical examination report from Dr. Warbritton, who performed an independent medical examination of Plaintiff in conjunction with her Workers' Compensation case. (AR 141-58, 162.) LINA reviewed the report as part of Plaintiff's second appeal, and noted that Dr. Warbritton failed to address Plaintiff's functional capacity during the Elimination Period, and thus that the report did not establish Plaintiff's entitlement to LTD benefits. (AR 20.) A medical director at LINA, Dr. Hall, also reviewed Plaintiff's file. (AR 16, 134; Defs.' Mot. 7:12-14, Dkt. #40.) On September 5, 2007, Dr. Hall noted that Plaintiff's medical records failed "to reveal significant documented clinical findings to support the imposed restrictions." (AR

11

134.)

On September 11, 2007, LINA sent Plaintiff a letter informing her of the decision to deny her second appeal. (AR 129-31.) Plaintiff was informed that her complete file "was reviewed in its entirety without deference to prior reviews." (AR 130.) Plaintiff was further informed that in order to "ensure accurate interpretation of the medical records on file, [her] appeal was reviewed by [LINA's] Medical Director." *Id.* The denial of appeal letter discusses the medical director's review of all of Plaintiff's medical records, and states that the medical director "failed to find significant findings to support a restriction from a light duty occupation." *Id.* The letter continues on to state that "the medical records do not support a functional impairment that would preclude you from performing your own occupation. Therefore we must uphold our previous decision to deny your claim." *Id.* Finally, the letter informed Plaintiff that she has exhausted her administrative appeals and that she has the right to bring a claim under ERISA. *Id.*

### III. PROCEDURAL BACKGROUND

**A.      The Complaint and Motion to Strike**

On April 11, 2008, Plaintiff filed suit against Defendants seeking LTD benefits from the Plan under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* (Dkt. #1.) On December 18, 2008, following court-sponsored mediation, Plaintiff filed her First Amended Complaint ("FAC"). (Dkt. #26.) In her FAC, Plaintiff added a second cause of action against LINA only for breach of fiduciary duty. (FAC ¶¶ 9-19, Dkt. #26.) On January 5, 2009, Defendants filed a motion to strike certain allegations in Plaintiff's breach of fiduciary duty claim. (Dkt. #28.) Plaintiff did not immediately file an opposition, but on March 12, 2009 responded to Defendants' motion to strike in a subsequent filing. (Dkt. #45.) On March 19, 2009, Defendants filed their reply. (Dkt. #48.)

**B.      Dispositive Motions**

On February 26, 2009, Defendants filed a motion for judgment, or in the alternative, for summary judgment, on Plaintiff's claim for ERISA benefits. (Dkt. #40.) That same day, Plaintiff also filed a motion for judgment on her claim for benefits (Dkt. #43), to which Defendants filed an

United States District Court
For the Northern District of California

**UNITED STATES DISTRICT COURT**
For the Northern District of California

opposition on March 12, 2009 (Dkt. #44). On March 12, 2009, Plaintiff filed her reply brief. (Dkt. #45.) On March 19, 2009, Defendants filed their reply in support of their motion for judgment. (Dkt. #48.)

**C.      Plaintiff's Request for Discovery and Supplemental Conflict Memoranda**

On August 17, 2009, the Honorable Vaughn R. Walker, the presiding judge in the matter, issued an order finding that Plaintiff was entitled to conduct limited discovery into whether LINA's structural conflict of interest, which exists where the insurer both administers and funds the Plan, affected the denial of LTD benefits. (*Order* 3:5-6, 8:19-23, Dkt. #53.) Judge Walker ordered the parties to submit supplemental briefing relating to how, if at all, LINA's structural conflict of interest should affect the Court's standard of review. *Id.* at 9:3-8. Furthermore, Judge Walker ruled that the standard of review to be applied in the matter is abuse of discretion. *Id.* at 2:12.

On November 2, 2009, Plaintiff filed her supplemental brief regarding the structural conflict of interest. (Dkt. #58.) On November 9, 2009, Defendants filed an opposition (Dkt. #67).

On October 26, 2009, Plaintiff filed a letter seeking the Court's guidance on three main discovery issues. (Dkt. #56.) On January 13, 2010, Judge Walker ordered Defendants to respond directly to the issues raised in Plaintiff's letter. (Dkt. #69.) On January 27, 2010, Defendants filed that response. (Dkt. #70.)

**D.      Referral of Pending Matters**

On February 24, 2010, Judge Walker issued an order which proposed the referral of each of the above matters to a magistrate judge for preparation of a report and recommendation and sought the parties' consent to the referral. (*Order*, Dkt. #71.) On March 17, 2010, Defendants filed their response declining to consent. (Dkt. #72.) The following day, Plaintiff filed her response consenting to the referral. (Dkt. #73.) On April 19, 2010, Judge Walker issued an order referring "all outstanding matters" to the undersigned. (Dkt. #74.)

**E.      Plaintiff's Additional Motion for Judgment**

On May 13, 2010, Plaintiff filed a motion for judgment on her breach of fiduciary duty claim. (Dkt. #77.) On May 27, 2010, Defendants filed an opposition (Dkt. #80), and on June 3,

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

2010, Plaintiff filed her reply.  (Dkt. #81).

On June 17, 2010, the undersigned held a hearing on all pending matters.  The undersigned shall discuss each issue in turn.

### IV.  DISCUSSION

**A.      Defendants' Motion to Strike**

In her FAC, Plaintiff added a claim for relief against LINA only for breach of fiduciary duty. (Dkt. #26.)  Plaintiff alleges that LINA, as a plan fiduciary, violated 29 U.S.C. §§ 1104(a) and 1140 by failing to act solely for the benefit of plan beneficiaries and by discriminating against ERISA plan beneficiaries.  (FAC ¶¶ 11, 12.)  Plaintiff claims that she is entitled to general and punitive damages arising out of the alleged discrimination, and further seeks a jury trial on her second cause of action.  *Id.* at ¶¶ 13, 16, 8:1-21.

In their motion, Defendants move to strike the following allegations in the second claim for relief in Plaintiff's FAC:  (1) Plaintiff's claim for general damages in the amount of $500,000 or according to proof (FAC ¶¶ 13, 16); (2) Plaintiff's claim for punitive damages in the amount of $1,000,000 or according to proof (FAC ¶ 16); and (3) Plaintiff's demand for jury trial (FAC 8:21) (Defs.' Mot. to Strike 2:8-21, Dkt. #28-1.)  Alternatively, Defendants move for judgment on the pleadings as to the above allegations in Plaintiff's FAC.  *Id.* at 2:22-23.  Defendants argue that ERISA establishes the exclusive remedies available on a claim for breach of fiduciary duty, and that they do not include extra-contractual, compensatory, or punitive damages.  *Id.* at 2:24-3:2. Defendants contend that a plan beneficiary who alleges a breach of fiduciary duty claim cannot seek individual relief, but must seek to benefit the Plan as a whole.  *Id.* at 5:17-18.  Defendants also argue that case law makes clear that there is no jury trial available in ERISA matters.  *Id.* at 3:5-6.

In response, Plaintiff states that "[a]t a minimum, Ms. Munn is entitled to equitable relief, and to an injunction proscribing the breach[ ] of fiduciary duty . . . .  She may not gain monetary relief which is additional to that which she is otherwise entitled, but she is entitled to have her claim administered by a fiduciary who is following the rules, not breaking them."  (Pl.'s Reply Br. 12:9-

14

12, Dkt. #45.)[11]

### 1.    Legal Standard

Federal Rule of Civil Procedure ("Rule") 12(f) provides that in response to a motion made by a party, a court may strike from the pleading "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  "Redundant allegations are those that are needlessly repetitive or wholly foreign to the issues involved in the action."  *California Dep't of Toxic Substances Control v. Alco Pacific, Inc.*, 217 F. Supp. 2d 1028, 1033 (C.D. Cal. 2002) (internal quotations omitted).  "Immaterial matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded."  *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1994) (internal quotations omitted).  "Impertinent matter consists of statements that do not pertain, and are not necessary, to the issues in question."  *Id.* (internal quotations omitted).

### 2.    Application to the Case at Bar

Defendants contend that Plaintiff's claims in her FAC for compensatory and punitive damages are improper because those remedies are not available under ERISA and no evidence on them is admissible.  (Defs.' Mot. to Strike 5:3-6, Dkt. #28-1.)  Defendants argue that ERISA does not provide for recovery of personal damages, as sought by Plaintiff, because such relief would only benefit Plaintiff individually and not Plan beneficiaries as a whole.  *Id.* at 6:3-6.  As to Plaintiff's jury trial demand, Defendants argue that it is defective as a matter of law.  *Id.* at 5:6-7.  In their reply, Defendants maintain that Plaintiff stated no opposition to their motion to strike her general damages claim, punitive damages claim, and her demand for a jury trial.  (Defs.' Reply 1:5-8, Dkt. #48.)

Plaintiff's response is that "[s]he may not gain monetary relief which is additional to that which she is otherwise entitled, but she is entitled to have her claim administered by a fiduciary who is following the rules, not breaking them."  (Pl.'s Reply Br. 12:9-12, Dkt. #45.)  Other than this sentence, she offers no relevant argument in response to Defendants' motion to strike.

---

[11]Plaintiff did not file an opposition to Defendants' motion to strike.  Rather, Plaintiff responded to the motion in her Reply in Support of Plaintiff's Motion for Judgment.

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

"An individual beneficiary may bring a fiduciary breach claim, but must do so for the benefit of the ERISA plan." *Massachusetts Mutual Life Ins. v. Russell*, 473 U.S. 134, 144 (1985); *Moreland v. Behl*, 1996 WL 193843, at *16 (N.D. Cal. April 17, 1996). "Any recovery for a violation of [29 U.S.C. § 1109] must be on behalf of the plan as a whole, rather than on behalf of individual beneficiaries." *Id.* "Extracontractual, compensatory and punitive damages are not available under ERISA." *Bast v. Prudential Ins. Co. of America*, 150 F.3d 1003, 1009 (9th Cir. 1998). Additionally, "there is no right to a jury trial in ERISA cases . . . ." *Ingram v. Martin Marietta Long Term Disability Income Plan*, 244 F.3d 1109, 1114 (9th Cir. 2001).

29 U.S.C. § 1109 sets forth liability for breach of an ERISA fiduciary's duties, and provides that any fiduciary under the terms of the plan:

> [W]ho breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

Based on the authority above, the undersigned agrees with Defendants that Plaintiff has failed to provide any legal support which shows that she is entitled to the damages she claims, or that she is entitled to a jury trial on her second cause of action. Section 1109 does not appear to grant a private right of action for damages or to entitle Plaintiff to recover personal damages for her alleged breach of fiduciary duty or discrimination claims, as such relief would only benefit Plaintiff and not the Plan as a whole. *See Mass. Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 144 (1985). Further, the cases cited above indisputably hold that such damages are not available under ERISA, just as there is no right to jury trial under ERISA. Accordingly, the undersigned RECOMMENDS that the Court GRANT Defendants' motion to strike in its entirety.

**B.     LINA's Structural Conflict of Interest**

Judge Walker previously ruled that abuse of discretion was to be the standard applied in this matter. (*Order* 2:12, Dkt. #53.) Judge Walker held that Plaintiff was entitled to conduct discovery on the conflict of interest so that all information regarding the conflict of interest and the effect it

would have on the standard of review would be before the court prior to ruling on dispositive motions.  (*Order* 8:19-28, Dkt. #53.)  Judge Walker ordered Plaintiff to conduct discovery "on any structural conflict of interest LINA may have had in reviewing plaintiff's application for benefits . . . [and to] submit a supplemental memorandum, with supporting evidence, relating to how, if at all, any conflict of interest should affect the court's standard of review."  (*Order* 8:28- 9:8, Dkt. #53.)

Both parties address LINA's structural conflict of interest in their moving papers as well as in their supplemental conflict memoranda.  In her reply brief, Plaintiff asks the Court to consider the following in its analysis of the affect of LINA's structural conflict of interest:  (1) the Plan referred Plaintiff to "Advantage 2000 " to secure Social Security Disability benefits, "which is inconsistent with a decision that [Plaintiff] is not disabled"; (2) the Plan failed to use an independent medical consultant to review Plaintiff's file; (3) the Plan failed to use an independent expert licensed in California, which Plaintiff argues is required under the Policy; (4) the Plan failed to provide Plaintiff with specific reasons for denying benefits, and thus Plaintiff did not have the information necessary to perfect her claim; and (5) the Plan rejected Plaintiff's own statements of disability, thereby arbitrarily refusing to credit reliable evidence.  (Pl.'s Reply Br. 5:26-6:19, Dkt. #45.)

In her supplemental conflict memorandum, Plaintiff contends that "the weight of the evidence of conflict is overwhelming."  (Pl.'s Supp. Br. 11:4, Dkt. #58.)  In support of that contention, Plaintiff argues that: (1) LINA does not have a reasonable claims handling process because it does not follow applicable administrative standards; (2) LINA refuses to consider evidence that an insured has too much pain to work on the basis that pain is not "inherently measurable"; (3) LINA employees could not identify any conceivable evidence which Plaintiff could have submitted that would demonstrate she has too much pain to work; and (4) the claims adjuster handling Plaintiff's claim must have known of "the relationship between denying claims and the fortunes not only of his own company, but of the company stock in his retirement plan."  *Id.* at 11:20-12:13.

In their reply in support of their motion for judgment, Defendants maintain that the structural conflict of interest did not affect LINA's claim decision, and that Plaintiff has failed to establish

17

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   otherwise.  (Defs.' Reply Br. 11:3-4, 12:12-13, Dkt. #47.)  Defendants argue that: (1) LINA's

2   assistance to Plaintiff in her application for Social Security Disability benefits does not suggest bias;

3   (2) LINA was not required to use an independent medical consultant to review Plaintiff's file; (3)

4   LINA's employees who reviewed Plaintiff's file were not required to be licensed in California; (4)

5   LINA complied with ERISA requirements and provided Plaintiff with specific reasons for the denial

6   of benefits; and (5) LINA considered Plaintiff's self-reports of disability, but was not required to

7   conclude that those reports were determinative.  *Id.* at 11:2-16, 2:11-24.

8         In their opposition to Plaintiff's supplemental conflict memorandum, Defendants argue that

9   there is no evidence that the structural conflict improperly affected LINA's determination to deny

10  Plaintiff LTD benefits.  (Defs.' Supp. Br. 1:11-12, Dkt. #67.)  Defendants state that "LINA has taken

11  active steps to reduce potential bias and to promote accuracy in its claim handling."  *Id.* at 11:13-14.

12  Addressing each of Plaintiff's points, above, Defendants put forth the following arguments.  First,

13  Defendants argue that LINA complied with ERISA standards by advising both Plaintiff and her

14  physicians of the information required to support Plaintiff's claim for benefits.  *Id.* at 6:18-19.

15  Second, Defendants contend that LINA considered Plaintiff's subjective reports of pain in

16  determining her claim, "but found such evidence outweighed by the information provided by her

17  treating physicians which established that plaintiff's pain did not result in functional restrictions or

18  limitations which prevented her from performing her regular occupation."  *Id.* at 3:1-6.  Third,

19  Defendants maintain that Plaintiff's claim was not denied based on a lack of objective findings

20  regarding pain and that her complaints of pain were well-documented and taken into consideration.

21  *Id.* at 4:16-17; 6:5-6.  Finally, Defendants argue that there is substantial evidence proving that LINA

22  employees do not have a financial incentive to deny LTD claims.  *Id.* at 13:1-2.

23        The undersigned will consider each of Plaintiff's arguments in turn.

24        1.    <u>Legal Standard</u>

25        Abuse of discretion review shall be informed "by the nature, extent, and effect on the

26  decision-making process of any conflict of interest that may appear in the record.  This standard

27  applies to the kind of inherent conflict that exists when a plan administrator both administers the

28

18

UNITED STATES DISTRICT COURT
For the Northern District of California

plan and funds it, as well as to other forms of conflict." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 967(9th Cir. 2006). "[T]he precise standard in cases where the plan administrator is also burdened by a conflict of interest is only discernable by carefully considering the conflict of interest, including evidence outside of the administrative record that bears upon it." *Nolan v. Heald College*, 551 F.3d 1148, 1153-54 (9th Cir. 2009). This "necessarily entails a more complex application of the abuse of discretion standard. Specifically, a modicum of evidence in the record supporting the administrator's decision will not alone suffice in the face of such a conflict . . . ." *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 626 (9th Cir. 2009).

If the facts and circumstances underlying the denial of benefits "indicate the conflict may have tainted the entire administrative decisionmaking process, the court should review the administrator's stated bases for its decision with enhanced skepticism: this is functionally equivalent to assigning greater weight to the conflict of interest as a factor in the overall analysis of whether an abuse of discretion occurred." *Id.* at 631. Similarly,

> A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial, fails adequately to investigate a claim or ask the plaintiff for necessary evidence, fails to credit a claimant's reliable evidence, or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.

*Abatie*, 458 F.3d at 968-69 (internal citations omitted). However, "[t]he level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history." *Id.* at 968. Thus, if the conflict of interest improperly motivates the insurer's decision to deny benefits, the insurer will be found to have abused its discretion. *Montour*, 588 F.3d at 637. However, the existence of a conflict is only one factor to consider in determining whether there has been an abuse of discretion by the administrator. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, ___[12], 128 S. Ct. 2343, 2350 (2008).

In general, "where the abuse of discretion standard applies in an ERISA benefits denial case,

---

[12]Page numbers are not yet available for this reporter.

a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Nolan v. Heald College*, 551 F.3d 1148, 1154 (9th Cir. 2009) (citing *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999)).  However, this was the standard pre-*Abatie*, "where the district court's review was limited to the administrative record and the claimant was not entitled to a jury trial." *Id.*  Where the district court considers evidence outside the administrative record in determining the effect that the insurer's conflict of interest has on the abuse of discretion review, the court must view that evidence "through the lens of the traditional rules of summary judgment[,]" meaning in the light most favorable to the non-moving party.  *Id.* at 1155.

> 2.    Application to the Case at Bar

The undersigned must now determine what weight to allocate to the conflict of interest in determining whether LINA abused its discretion.

> *a.    LINA's Assistance to Plaintiff in her Application for SSD Benefits*

Plaintiff contends that because LINA referred  her to "Advantage 2000" to secure representation in her application for social security disability benefits, the Court should weigh this against LINA in its analysis of whether the structural conflict of interest affected the decision to deny benefits.  (Pl.'s Mot. 8:2-14, Dkt. #43.)  Plaintiff argues that this referral is inconsistent with a decision by LINA that she is not disabled.  (Pl.'s Reply Br. 6:2-5, Dkt. #45.)

In response, Defendants contend that the assistance to Plaintiff in applying for social security disability benefits should not increase the level of skepticism the Court employs in its abuse of discretion review.  (Defs.' Opp'n 5:7-8, Dkt. #44.)

Plaintiff maintains that the facts in *Glenn* are applicable here.  In *Glenn*, MetLife found that the plaintiff was eligible to receive short term disability benefits for a 24-month period.  *Glenn*, 128 S. Ct. at 2346.  During that time, MetLife referred the plaintiff to a law firm that would assist her in her application for social security disability benefits.  *Id.*  Notably, MetLife itself would be entitled to receive a portion of any social security disability benefits payable to the plaintiff as an offset to the more generous plan benefits.  *Id.*  The Social Security Administration ("SSA") found that the

**UNITED STATES DISTRICT COURT**
For the Northern District of California

plaintiff was permanently totally disabled, and granted her disability benefits as well as back benefits for a two-year period. *Id.* at 2346-47. However, the plaintiff did not keep any of the back benefits for herself. *Id.* at 2347. MetLife received three quarters of the lump sum, and the rest, plus an additional sum, went to the plaintiff's attorneys. *Id.* MetLife subsequently denied the plaintiff's application for LTD benefits because she was unable to prove that she was incapable of performing full-time sedentary work. *Id.* The plaintiff filed suit, and the district court upheld the denial of benefits. *Id.* The plaintiff then appealed to the Sixth Circuit, which set aside Met Life's denial of benefits based upon a combination of factors, two of which were the structural conflict of interest and MetLife's "failure to reconcile its own conclusion that Glenn could work in other jobs with the [SSA]'s conclusion that she could not . . . ." *Id.* MetLife then appealed to the United States Supreme Court, which granted certiorari. *Id.* In affirming the Sixth Circuit's decision, the Court stated:

> [T]he [Sixth Circuit] found questionable the fact that MetLife had encouraged Glenn to argue to the Social Security Administration that she could do no work, received the bulk of the benefits of her success in doing so (the remainder going to the lawyers it recommended), and then ignored the agency's finding in concluding that Glenn could in fact do sedentary work. This course of events was not only an important factor in its own right (because it suggested procedural unreasonableness), but also would have justified the court in giving more weight to the conflict (because MetLife's seemingly inconsistent positions were both financially advantageous).

*Id.* at 2352 (internal citations omitted).

In the case at bar, the facts are distinguishable from Glenn. Defendants referred Plaintiff to Advantage 2000 Consultants on November 29, 2006. (AR 338-40.) On October 20, 2008, Plaintiff received a letter from the SSA informing her that her claim for benefits had been denied because she was considered not disabled under SSA rules. (Higbee Decl., Ex. B, Dkt. #44-1.) The letter informed Plaintiff that the SSA determined that her condition was not severe enough to prevent her from working in her position as a "Car Rental Manager". *Id.* The SSA "considered the medical and other information, your age, education, training, and work experience in determining how your condition affects your ability to work . . . . Your statements about your conditions and how they limit your ability to perform work related activities are not fully supported by the evidence in file." *Id.* On this basis alone, *Glenn* is inapposite because there, SSA found the plaintiff to be totally and

21

1   permanently disabled. *Glenn*, 128 S. Ct. at 2346-47. Additionally, unlike in *Glenn*, LINA received

2   no financial advantage by its referral because the claim was denied and LINA would not have been

3   entitled to an offset under the Policy based on "other income" received by Plaintiff. (Defs.' Opp'n

4   6:1-4, Dkt. #44.) Finally, LINA's claim determination was made prior to learning of the SSA's

5   decision, on September 11, 2007 (AR 129-31), and was consistent with the SSA's decision, unlike in

6   *Glenn*.

7        Accordingly, the undersigned finds that LINA's referral of Plaintiff to Advantage 2000

8   Consultants does not suggest bias and thus should not bear on the level of skepticism the Court will

9   employ in its review of LINA's denial of Plaintiff's claim for LTD benefits.

10             *b.      LINA's Failure to Employ an Independent Medical Consultant*

11       In her supplemental conflict memorandum, Plaintiff notes that her case manager, Eric

12   Poliziani, relied only upon the advice of the nurse case manager and LINA's retained physician, Dr.

13   Hall, in determining that Plaintiff's claim should be denied. (Pl.'s Supp. Br. 9:1-10:1, Dkt. #58.) In

14   her reply brief, Plaintiff conclusorily states that the Court's abuse of discretion review should be

15   tempered with skepticism because "The Plan failed to use an independent medical consultant, and

16   only used one of its own 'Medical Director's . . . ." (Pls' Reply Br. 6:6-8, Dkt. #45.)

17       In response, Defendants argue that LINA is not required under the terms of the Policy or

18   under ERISA to employ an independent medical examiner to determine whether claimants are

19   disabled under the Policy. (Defs.' Opp'n 10:3-6, Dkt. #44.)

20       Where an insured has been found disabled under the Policy and LTD benefits are payable,

21   LINA must calculate the amount of benefits owed. (LINA 109.) "The Disability Benefit Payable to

22   the Employee is figured using the Gross Disability Benefit, Other Income Benefits, calculation of

23   Optimum Ability and the Return to Work Incentive." *Id.* "Optimum Ability" is defined as "the

24   greatest extent of work the Employee is able to do in any occupation based on education, training or

25   experience." (LINA 108.) LINA determines the employees ability to work based upon: "(1)

26   medical evidence submitted by the Employee; (2) consultation with the Employee's Physician; and

27   (3) evaluation of the Employees ability to work by not more than three Independent Experts if

28

22

required by the Insurance Company." *Id.*  The Independent Expert must be: (1) licensed, registered or certified as required by the laws of the state in which the evaluation is made; and (2) acting within the scope of that license, registration or certificate." *Id.*

Here, LINA was never required to determine Plaintiff's optimum ability because Plaintiff was found not to be disabled under the Policy.  Thus, LINA was not required to employ an independent medical consultant to review Plaintiff's file prior to making a decision.  Further, "ERISA . . . does not require that an insurer seek independent medical examinations."  *Kushner v. Lehigh Cement Co.*, 572 F. Supp. 2d 1182, 1192 (C.D. Cal. 2008) (citing *Rutledge v. Liberty Life Assur. Co. of Boston,* 481 F.3d 655, 661 (8th Cir.2007)*; Fought v. UNUM,* 379 F.3d 997 (10th Cir.2004)*; Gooden v. Provident Life & Acc. Ins. Co.,* 250 F.3d 329, 335 (5th Cir.2001)*; Stith v. Prudential,* 356 F.Supp.2d 431 (D.N.J.2005)*; Conti v. Equitable,* 227 F.Supp.2d 282, 292 (D.N.J.2002)*; Mason v. M.F. Smith & Assoc., Inc.,* 158 F.Supp.2d 673, 685 (D.S.C.2001)).

Accordingly, LINA was not required to employ an independent medical consultant to review Plaintiff's file prior to determining that she did not qualify for benefits.  Thus, the failure to employ an independent medical consultant will have no effect on the Court's review of LINA's decision.

> c.  *Review of Plaintiff's File by Persons not Licensed in California*

In her motion for judgment, Plaintiff argues that the Plan failed to comply with "the requirements" that it only use experts licensed in California.  (Pl.'s Mot. 6:18-:7:3, Dkt. #43.)  Plaintiff argues, based on the language cited in the previous subsection (LINA 108), that because the evaluation of Plaintiff's ability to work occurred in California, LINA was required to hire independent experts licensed in California.  (Pl.'s Mot. 7:4-7, Dkt. #43.)  Plaintiff refers to the evaluation by Dr. Hall, LINA's Medical Director, and argues that he is not licensed in California.  (*Id.* at 7:8-9; Higbee Decl., Ex. A, Dkt. #44-1.)  Plaintiff also refers to LINA's nurse case manager, Jeff Weber, and argues that he is not licensed in California.  (Pl.'s Mot. 7:24-25, Dkt. #43.)

In response, Defendants state that Dr. Hall and Jeffrey Weber were employees of LINA who reviewed Plaintiff's file to determine whether she qualified for benefits.  (Defs.' Opp'n 11:20-21, Dkt. #44; AR 28, 167, 177-81.)  Defendants contend that Dr. Hall and the nurse case manager are

23

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   not independent experts, as suggested by Plaintiff, they did not examine Plaintiff, and there is no

2   requirement that they be licensed in California in order to conduct a medical record review for

3   LINA.  (Defs.' Opp'n 11:23-25, Dkt. #44.)

4           The undersigned agrees with Defendants.  As discussed in the previous section, the review

5   by an independent medical examiner is not required by LINA, and only applies in situations where

6   LINA finds that the insured is entitled to LTD benefits.  Accordingly, that Dr. Hall and the nurse

7   case manager were not licensed in California has no bearing on the review of LINA's claim

8   decision.

9                   d.      *Whether Plaintiff was Provided with Specific Reasons for the Denial or the*
                            *Information Necessary to Perfect Her Claim*

10          Plaintiff contends that the Court should view LINA's decision with skepticism based on its

11  alleged failure "to comply with ERISA's requirement that it provide specific reasons for denying

12  benefits, and ERISA's requirement that it tell the beneficiary how to perfect her claim[,]" in

13  language which she could understand.  (Pl.'s Mot. 9:4-8, Dkt. #43; Pl.'s Reply Br. 6:13-15, Dkt.

14  #45.)  Plaintiff maintains that the language in the denial letters is boilerplate, wholly useless, and

15  uninformative.  (Pl.'s Supp. Br. 5:3-7, Dkt. #58.)

16          In response, Defendants contend that Plaintiff was consistently advised of the reason her

17  claim was denied:  because she had not provided documentation which established that she was

18  unable to perform the material duties of her occupation.  (Defs.' Opp'n 6:11-16, Dkt. #44; Defs.'

19  Supp. Br. 6:15-18, Dkt. #67.)  Defendants maintain that both Plaintiff and her physicians were

20  informed by LINA of the additional information required to support her claim for benefits.  (Defs.'

21  Supp. Br. 6:18-19, Dkt. #67.)

22          29 C.F.R. § 2560.503-1(g) governs the requirements of an insurer's denial of benefits, and

23  provides in pertinent part:

24          The notification shall set forth, in a manner calculated to be understood by the
            claimant--
25          (i) The specific reason or reasons for the adverse determination;
            (ii) Reference to the specific plan provisions on which the determination is based;
26          (iii) A description of any additional material or information necessary for the
            claimant to perfect the claim and an explanation of why such material or information
27          is necessary;
            (iv) A description of the plan's review procedures and the time limits applicable to
28

such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review . . . .

The Ninth Circuit has interpreted this regulation as "calling for a meaningful dialogue between claims administrator and beneficiary." *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 870 (9th Cir. 2008) (citing *Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir.1997)) (internal quotations omitted). "If the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it. There is nothing extraordinary about this; it's how civilized people communicate with each other regarding important matters." *Booton*, 110 F.3d at 1463.

In *Booton*, the plaintiff was kicked in the mouth by a horse, leaving four of her front teeth hanging from her gums. *Id.* at 1462. The plan which covered the plaintiff "excluded ordinary dental work, but did cover work 'required on account of accidental injury to natural teeth.'" *Id.* In order to reset her front teeth, the plaintiff's dentists had to perform certain treatments to her back teeth, which were not injured, and her dentists attested that none of the procedures had anything to do with a pre-injury condition. *Id.* The plan's insurer, Aetna, denied the plaintiff's claim for any work done on the back teeth, reasoning that the back teeth had not been injured. *Id.* The plan's consulting dentist made notes as to which records Aetna should request, and stated that pre-injury x-rays would help to substantiate the plaintiff's claim. *Id.* However, Aetna never requested such dental records or information, nor did they follow up on the consulting dentist's opinion. *Id.* Unsurprisingly, each of the three denial letters sent to the plaintiff stated : "[t]he attached claim is being returned to you. Please be advised that we insure the claimant for medical expenses only. Therefore, please submit the claim to the Dental Carrier." *Id.* When the plaintiff hired an attorney to write a letter to Aetna, she received a two-page letter denying her claim, which stated: "[I]t has been determined . . . that some of the dental work claimed . . . was not the result of an accidental injury." *Id.* at 1463. The plaintiff filed suit, lost on summary judgment, and appealed to the Ninth Circuit. *Id.* The court held that Aetna denied benefits without a rational explanation, failed to even acknowledge the plaintiff's argument that her back teeth needed work because of the injury to her front teeth, failed to ask for

key dental records, and noted that the "record shows that plaintiff's dentists were ready and able to explain their work but no one at Aetna sought their explanations." *Id.* "Lacking necessary-and easily obtainable-information, Aetna made its decision blindfolded." *Id.* The court held that Aetna's denial was an abuse of discretion. *Id.* at 1464.

Here, LINA engaged in a dialogue far more meaningful and understandable than Aetna did in *Booton*. The first denial letter, sent on January 17, 2007, informs Plaintiff of receipt of her claim, "in which you documented you were unable to work due to Right foot pain, due to toe problem. You indicated that you stand or wear shoe for an extended period. You also advised of lower back pain and pain in the left hand and thumb." (AR 260.) The letter sets for the definition of disability under the Policy and the requirements of continuous disability under the Elimination Period, and explains that Plaintiff's position with Hertz is classified as "Light Work" under the DOT. (AR 259-60.) The letter goes on to state that multiple requests for copies of "office visit notes, imaging reports, diagnostic test results, restrictions and limitations" were sent to Drs. Mizock, Baldwin, Chesley and Sinclair, all of whom Plaintiff identified as her treating physicians. (AR 260.) Plaintiff was informed that LINA had received a PAA form from Dr. Williams, which provided that Plaintiff could "sit, stand and balance continuously, climb stairs frequently and ladders occasionally." *Id.* Beyond that, Plaintiff's "other treating providers ha[d] not responded to [LINA's] requests for copies of office notes, treatment plan, imaging reports, restrictions and limitations." *Id.* LINA informed Plaintiff that they had "closed [her] claim and no benefits [were] payable as the restrictions of no work [were] not supported by the documentation received[,]" because based upon the restrictions and limitations provided as well as Plaintiff's reported functional ability and the requirements of her occupation, they were "unable to document any restrictions or limitations which prevent [Plaintiff] from performing [her] duties as a Senior Station Manager." (AR 260-61.)

Regarding her anticipated appeal, LINA informed Plaintiff that they "would be happy to consider any medical evidence which supports [her] total disability. Medical evidence includes, but is not limited to: physician's office notes, hospital records, operative reports, consultation reports, test result reports, therapy notes, physical and/or mental limitations (i.e. Functional Capacities

26

Testing), etc." (AR 261.)  The letter also states that the "medical records should cover the period of May 2006 through the present."  *Id.*  The letter then informed Plaintiff that she was entitled to sue under ERISA after exhaustion of the administrative appeal process.  *Id.*

On March 2, 2007, Plaintiff appealed the denial of her claim and both she and her physicians submitted additional evidence for LINA's review.  (AR 182-250, 256-57.)  LINA denied Plaintiff's appeal and informed her of this by letter on May 15, 2007.  (AR 164.)  The letter again informed Plaintiff of the definition of disability under the Policy and the requirement that Plaintiff be continuously disabled throughout the Elimination Period, and that her job duties were classified as Light Work under the DOT.  (AR 164-65.)  The author reminded Plaintiff of the documents and information which LINA possessed when it made the initial denial, and then in detail for nearly two pages lists the information received and reviewed by LINA on appeal.  (AR 166-67.)

The additional documentation is discussed in the denial letter as follows.  LINA received an office note from Dr. Sinclair dated May 23, 2006, in which Plaintiff reported right foot pain for several weeks and experienced pain to the touch on the top of her right foot during the examination. (AR 166.)  During that time, Plaintiff was waiting for arrival of a custom-made orthotic for her foot. *Id.*  Dr. Sinclair noted that there were no signs of infections, swelling or redness, and advised Plaintiff to protect her foot with a shoe, not to bend her toes back, not to wear tight shoes, low heels or soft soles.  *Id.*  Dr. Sinclair put Plaintiff off work for one week.  *Id.*  LINA received another office note from Dr. Sinclair dated June 5, 2006 documenting Plaintiff's complaint of discomfort between the toes of her left foot.  *Id.*  Dr. Sinclair noted a callus on Plaintiff's fourth toe, which he planned to reduce.  *Id.*  Dr. Sinclair told Plaintiff to continue to use a post-operative shoe and to remain off work for a week.  *Id.*

LINA received an office note from Dr. Mizock dated June 12, 2006, documenting Plaintiff's active health problems.  *Id.*  Dr. Mizock noted that Plaintiff reported pain in her left wrist, and pursuant to an abnormal exam, diagnosed her with Dequervain's.  *Id.*  Dr. Mizock noted that Plaintiff was using a splint for her thumb and icing it, but was seeing little improvement.  *Id.*  Dr. Mizock also noted Plaintiff's complaint of numbness in the toes of her right foot.  *Id.*  Per Plaintiff's

request, Dr. Mizock extended Plaintiff's time off from work for ten days to get her pain under control. *Id.*  LINA received an office note from Dr. Mizock dated August 9, 2006, which documented that Plaintiff's left wrist was improving. *Id.*  Dr. Mizock also noted that Plaintiff's right foot toe numbness was improving with use of shoes with a wide toe base, but that the shoes exacerbated Plaintiff's low back pain. *Id.*  Following an exam, Dr. Mizock noted that Plaintiff's back had full range of motion with no tenderness, palpable spasm or pain on motion, and that her right foot revealed an absence of great toe flexion strength and subjective loss of sensation in that toe. *Id.*  Dr. Mizock noted that Plaintiff requested a note for continued disability with restrictions. *Id.*

LINA received a copy of Plaintiff's September 2, 2006 Cervical Spine MRI, which revealed that Plaintiff had a minimal disc bulge which was causing minimal narrowing in the central spinal canal. *Id.*  The report noted that, otherwise, Plaintiff's cervical spine appeared unremarkable. *Id.*

LINA received an office note from Dr. Mizock dated September 7, 2006, documenting that Dr. Mizock advised Plaintiff of the results of her MRI. *Id.*  Dr. Mizock noted that Plaintiff needed an extension for her continued disability, and that she would extend it through October 19, 2006, after which Plaintiff could return to work on modified duty. *Id.*  LINA received an office note from Dr. Mizock dated October 17, 2006, which noted that, per her physical therapist, Plaintiff needed additional time off work.  (AR 167.)  Following an exam, Dr. Mizock noted weakness and pain with extension of Plaintiff's left thumb. *Id.*  LINA received an office note from Dr. Mizock dated November 21, 2006, which documented a conversation regarding surgical options for Plaintiff's foot. *Id.*  LINA also received an office note from Dr. Mizock dated February 2, 2007, which documented Plaintiff's complaints of low back pain for ten days with bending or lifting, with no radiation down the leg. *Id.*  Plaintiff requested referral to a podiatrist for foot surgery. *Id.*  Following exam, Dr. Mizock noted that Plaintiff had mild to moderate pain associated with her foot, that there was no tenderness or mass in her low back but there was pain and a decreased range of motion. *Id.*

Following recitation of the medical information received, the letter states that LINA

28

reviewed the additional information provided with a nurse case manager. *Id.* The letter continues, "[i]n determining your eligibility for [LTD] benefits we need medical documentation which supports a no work restriction. In reviewing the information provided, no restrictions regarding your functional ability were provided. Your physician noted that upon your request continuing extensions for time off work were provided." *Id.* Based on the medical evidence and the restrictions and limitations provided by Plaintiff's doctors, LINA informed her that they were "unable to document any restrictions or limitations which prevent [her] from performing [her] duties as a Senior Station Manager." *Id.* The letter again informed her of her appeal rights. *Id.*

The record also shows that Plaintiff was contacted by telephone on May 16, 2007 by her claim manager, Mr. Poliziani, who noted that he informed her that her medical records did not support a finding of no work during the Elimination Period. (AR 22.) Mr. Poliziani noted that he advised Plaintiff of information needed to perfect her claim. *Id.*

In response to the second denial letter, Plaintiff submitted Dr. Warbritton's report, discussed in detail above, in conjunction with her second appeal. (AR 141-58, 162-63.) LINA again denied Plaintiff's appeal, recounting accurately the medical records discussed above. (AR 130.) Regarding Dr. Warbritton's report, the letter stated that "[o]n April 5, 2007, you underwent an Independent Medical Examination which was requested by your worker's compensation carrier. The IME indicated that you have been diagnosed with hallux valgus deformity in your right foot and you are awaiting corrective foot surgery." *Id.* The letter goes on to inform Plaintiff that LINA's Medical Director reviewed her appeal and that he failed to find significant findings which would support a restriction from a light duty occupation. *Id.* Specifically, "[t]he medical records reveal that x-rays of your foot were benign and examination revealed no swelling, infection or redness. Follow up office notes document overall normal examinations. In conclusion, the medical records do not support a functional impairment that would preclude you from performing your own occupation." *Id.* The letter then informed Plaintiff of her right to file suit under ERISA. *Id.*

Regarding Dr. Warbritton's report, upon which Plaintiff places much emphasis, the notes of the nurse case manager and the claim manager document that Dr. Warbritton's report failed to

address Plaintiff's functional capacity during the Elimination Period, the time period for which

Plaintiff was thrice instructed that she needed to provide information proving she was disabled.  (AR

20, 139.)  Unlike in *Booton*, LINA meticulously detailed the medical evidence and information

received in the denial letters sent to Plaintiff, and informed her exactly what she needed to submit to

perfect her claim:  objective findings which would support that she could not perform her own

occupation, which was considered Light Work, defined as:

> Exerting up to 20 pounds of force occasionally, or up to 10 pounds of force
> frequently, or a negligible amount of force constantly to move objects.  Physical
> demand requirements are in excess of those for Sedentary Work.  Even thought [sic]
> the weight lifted may be only a negligible amount, a job should be rated Light Work:
> (1) when it requires walking or standing to a significant degree; or (2) when it
> requires sitting most of the time but entails pushing or pulling of arm or leg controls;
> or (3) when the job requires working at a production rate pace entailing the constant
> pushing or pulling of materials even though the weight of those materials is
> negligible.  NOTE: The constant stress and strain of maintaining a production rate
> pace, especially in an industrial setting, can be and is physically demanding of a
> worker even thought [sic] the amount of force exerted is negligible.

(AR 165, 260.)  LINA informed Plaintiff as to the type of medical evidence she should submit, and

the time period that those records should cover.  (AR 261.)

    The denial letter at issue in *Holifield v. UNUM Life Ins. Co. of America*, 640 F. Supp. 2d

1224, 1239-40 (C.D. Cal. 2009), is more factually analogous to the instant matter.  In *Holifield*, the

plaintiff argued, as Plaintiff does here, that the insurance company failed to advise her how to

perfect her claim and that it sent her an uninformative denial letter.  *Id.* at 1239.  The letter informed

the plaintiff that "[b]ased on the current information in our claim file, and our review of the medical

information there is no documentation to support a disability beyond 9/4/02."  *Id.*  The court stated

that, while that language alone would likely have been insufficient, the letter went on to state that

"[t]he medical records in [sic] file document that your treating physician advised you to be off work

for a six month period. There are no physical or cognitive test results supporting a time frame of six

months that would preclude you from performing your occupational duties in a sedentary capacity."

*Id.*  The court found that UNUM clearly communicated to the plaintiff that she was being denied

benefits based on a finding that there was no objective evidence that she had any physical or

cognitive disability that would prevent her from performing her job. *Id.* at 1240.  The court further

**UNITED STATES DISTRICT COURT**
For the Northern District of California

noted that UNUM gave the plaintiff's treating doctors multiple chances to supplement the record, continuing to call and contact them in order to obtain their files, and accepted and reviewed additional information, and found that, taken together, UNUM had met its duty to engage in a meaningful dialogue with the plaintiff. *Id.*

Here, the undersigned finds that LINA has fulfilled its duty to engage in a meaningful dialogue with Plaintiff. Similar to the facts in *Holifield*, LINA contacted Plaintiff and her doctors on several occasions and informed her and them that additional information was required. In its letters, LINA recited the findings of Plaintiff's treating physicians, and informed her, by letter on three occasions and once over the phone, that the information provided did not establish that Plaintiff was unable to perform her own occupation during the Elimination Period. Because LINA communicated meaningfully with Plaintiff regarding the information required and the reasons for denial, this factor will have no bearing on the level of skepticism employed in the abuse of discretion review.

> e.    *Whether LINA's Claim Process is Reasonable*

Plaintiff argues that LINA does not have meaningful standards by which to assess whether she qualifies for a disability benefit and thus that LINA's stated reasons for denial are insufficient under applicable Ninth Circuit law. (Pl.'s Supp. Br. 4:13-20, Dkt. #58.) Plaintiff contends that LINA's administrative record must, but fails to, contain administrative processes and safeguards designed to ensure that benefit determinations are made pursuant to the documents that govern the Plan, and that the administrative record does not reflect that the Plan provisions have been applied consistently with respect to claimants similarly situated. (Pl.'s Mot. 10:26-11:2, Dkt. #43.) Plaintiff argues that if LINA is aware of objective measures of impairment that occur in cases similar to hers, then LINA is obliged to identify those measures so claims adjusters have a consistent standard to follow in determining what constitutes an objective measure of impairment. *Id.* at 11:12-17. Plaintiff further argues that this standard is required for even-handed claim handling treatment, that the standard must be included in the administrative record, and that LINA must inform Plaintiff of this standard in its denial letters and tell her what is required to meet the standard. *Id.* at 11:17-20. Plaintiff contends that the denial letters sent to her do not evince a standard, "because there is no

1    means by which anyone by LINA would know when its requirement has been met." *Id.* at 12:13-16.

2    Additionally, Plaintiff argues that Mr. Poliziani, her assigned claim manager, had no meaningful

3    standard by which to assess whether or not she qualified for benefits because he was unable to

4    identify evidence that Plaintiff could have offered to support her claim.  (Pl.'s Supp. Br. 3:6-4:16,

5    Dkt. #58.)  Plaintiff further argues that, by failing to provide clear written standards, "a small

6    number of employees can bias the entire claims process."  *Id.* at 8:20-22.

7        In response, Defendants contend that Plaintiff has cited no legal authority which requires that

8    an insurer include a copy of its claim procedures in the administrative record.  (Defs.' Opp'n 14:23-

9    15:3, Dkt. #44.)  Defendants argue that the absence of claim handling guidelines in the

10   administrative record does not show that claim procedures were not followed in a particular case.

11   *Id.* at 15:5-8.  Defendants maintain that Plaintiff provides no support for her position that LINA

12   failed to follow established claim procedures.  *Id.* at 16:1-2.  Defendants also contend that requiring

13   "objective" evidence of disability does not prove that LINA acted improperly.  *Id.* at 15:9-13.

14       In their supplemental brief, Defendants maintain that there is substantial evidence to prove

15   that LINA encourages accurate and competent claim handling.  (Defs.' Supp. Br. 11:9-10, Dkt. #67.)

16   Defendants contend that Mr. Poliziani was deposed more than two years after his handling of

17   Plaintiff's claim, and most importantly, counsel for Plaintiff failed to provided him with any

18   documents at the deposition and expected him to testify from memory.  *Id.* at 4:7-15.  Finally,

19   Defendants argue that the administrative record clearly demonstrates that the handling of Plaintiff's

20   claim was not biased.  *Id.* at 9:25-10:2.

21       Annie Hong, senior operations representative for LINA, declared that LINA has in place an

22   audit department to review claim files on a quarterly basis to address the accuracy, competency, and

23   timeliness of claims decisions.  (Hong Decl. ¶¶ 1, 8, Dkt. #44-2.)  Richard Lodi, another senior

24   operations representative for LINA, testified regarding LINA's claim handling.  (Padway Decl.[13],

25

26       [13]Docket No. 59 is the Padway Declaration, Docket No. 60 is a notice that all exhibits will be
     filed manually rather than electronically, and Docket Nos. 61-65 comprise the exhibits described in
27   the Padway Declaration.  Docket No. 61 is comprised of Exhibits 1-2 to the Padway Declaration;
     Docket No. 62 is comprised of Exhibits 3-5 to the Padway Declaration; Docket No. 63 is pages 1-
28

Ex. 8[14], Dkt. #65.)  When asked by Mr. Padway, counsel for Plaintiff, how LINA assures that two

different claimants with similar circumstances will be treated alike, Mr. Lodi responded:

> Well, there are various audits that take place to make sure that claims managers are
> applying the similar process to every claim.  I would suggest though that you could
> have a scenario where two individuals submit two claims where the facts maybe [sic]
> similar but because each claim is unique and each outcome is driven by the specific
> circumstances and facts of each claim, the outcomes could logically differ.

(Lodi Deposition 20:4-12, Dkt. #65.)  When questioned as to what LINA does to assure that

similarly situated claimants have similar results in their claim outcomes, Mr. Lodi testified that

"[t]he audits would ultimately get to the point of making sure we have made the correct decision, not

necessarily the same decision." *Id.* at 21:6-17.  Mr. Lodi also testified extensively regarding the

training material provided to LINA claims managers which teaches them how to evaluate and

investigate claims. *Id.* at 10:8-19:16.  Mr. Lodi testified that the training material pertaining to

evaluating medical information existed online, and that a CIGNA manual, dubbed "the book of

knowledge" discusses evaluating medical evidence. *Id.* at 12:5-8, 13:13-19.  Mr. Lodi explained

that there is also training and information which "speaks to vocational information, ascertaining the

physical and psychiatric demands of someone's occupation." *Id.* at 14:19-15:6.

Mr. Lodi was deposed in a similar case regarding LINA's policies and procedures, *Mattox v.

Life Ins. Co. Of N. Am.*, 2009 U.S. Dist. LEXIS 88061 (N.D. Georgia 2009).  The court there quoted

extensively from Mr. Lodi's testimony as to appeal procedures, lack of financial incentives for

employees to deny claims, lack of quotas for denial or approval of claims, and LINA's philosophy of

fairness in paying claims. *Id.* at *11-17.  Upon review of that testimony and the testimony given

here, it appears nearly identical.  Regarding LINA's audit procedures, Mr. Lodi similarly testified

that the audit department "reviews claim files on a quarterly basis[,] and that the "audits are

conducted to check the accuracy, competency, and timeliness of claims decisions in addition to

ensuring that relevant medical evidence is reviewed." *Id.* at *14-15.  Mr. Lodi testified to a further

---

199 of Exhibit 6; Docket No. 64 is pages 200-406 of Exhibit 6; Docket No. 65 is comprised of
Exhibits 7-12 to the Padway Declaration.

[14]Hereinafter, "Lodi Deposition".

UNITED STATES DISTRICT COURT
For the Northern District of California

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1  check on appeal in that the LINA employee conducting the appeal is tasked to "identify or look for

2  any trends in claims that are resulting perhaps in overturns, or things they're seeing that the core

3  team is doing that . . . they might disagree with." *Id.* at *15.

4        Upon review of Mr. Lodi's testimony, as well as other evidence offered by the plaintiff to

5  support her position that LINA's structural conflict of interest weighed on its decision to deny her

6  LTD benefits, the court held "that there are no factors in evidence to indicate that LINA's decision to

7  terminate Mattox's LTD benefits was arbitrary and capricious or that LINA's conflict of interest

8  improperly influenced its exercise of discretion. The evidence in the record shows that LINA's

9  decision was reasonable and supported by substantial evidence." *Id.* at *27-28.

10        Here, the undersigned finds that LINA does have claim handling guidelines, which they

11  routinely employ, as evidenced by the testimony of Mr. Lodi in this matter and in *Mattox*.  Further,

12  as noted by Defendants, Plaintiff has offered no support for her position that LINA is required to

13  include a copy of its claims procedures in the administrative record, or that the failure to include

14  these guidelines shows that LINA failed to follow them in a particular matter.  In fact, Plaintiff has

15  not provided any evidence which would indicate that LINA failed to follow established guidelines.

16        Plaintiff's two-plus page argument that the claims process is biased based upon the lack of

17  guidelines, without one citation to case law or statute, is equally unfounded, and the undersigned is

18  hesitant to give it credence here.  (Pl.'s Supp. Br. 8:18-22, Dkt. #58.)  Digression aside, Plaintiff

19  contends that the "team structure" of the team that handled her claim, comprised of a senior case

20  manager, a team leader, twelve claim managers, one nurse case manager, and one rotating physician,

21  "gives enormous power to a single physician, a single nurse case manager, or a single supervisor to

22  control the decisions of a dozen claim managers." *Id.* at 9:1-4, 10:3-4.  Plaintiff further argues that

23  "[i]n the absence of written guidelines and standards, a small handful of individuals could, if they

24  desired, save the company millions by tightening claim standards informally, with nothing at all in

25  writing– nothing more than a whispered conversation in passing." *Id.* at 10:4-7.  Plaintiff contends

26  that Mr. Poliziani relied solely on the opinion of the nurse case manager in evaluating her claim and

27  that he lacks the training or written guidance required to question the nurse case manager.  *Id.* at

28

9:16-21.  Plaintiff then argues that LINA makes no attempt to determine whether a claim was properly denied, and that there is no data to support the notion that it does.  *Id.* at 10:12-20.

As discussed above, LINA does have written guidelines and procedures, and Plaintiff offers no proof, other than conjecture and speculation, that they were not followed.  Further, there is ample evidence in the administrative record, specifically in the denial letter sent to Plaintiff, that evidence submitted by her treating doctors was considered.  The arguments advanced by Plaintiff to support her position that LINA has no claim handling guidelines and that the claims process is biased and unreasonable have no grounding in fact or law.

Accordingly, Plaintiff has failed to offer any support for her position that LINA's claims process is unreasonable, and thus, this factor will not bear on whether the undersigned tempers the abuse of discretion review with skepticism.

### f.      Whether Plaintiff's Self-Reports of Disability were Considered

Plaintiff argues, but offers no support for her argument, that LINA rejected her "own statements of her disability, as if they did not exist."  (Pl.'s Reply Br. 6:17-18, Dkt. #45.)  In response, Defendants contend that "LINA did not reject plaintiff's self-reports of disability without consideration, nor was LINA required to conclude that plaintiff's self-reports of disability were determinative."  (Defs.' Reply 11:15-16, Dkt. #47.)

A claimant's subjective complaints of pain need not be accepted at face value; rather, the insurer is entitled to rely on the opinions of experts in making the disability determination.  *Kushner*, 572 F. Supp. 2d at 1191-92; *see also Salomaa v. Honda Long Term Disability Plan*, 542 F. Supp. 2d 1068, 1079 (C.D. Cal. 2008) (finding it appropriate to give a low level of deference to the reports of the plaintiff's treating physicians where those reports were based almost entirely on the plaintiff's self-reports of his own disability).  "A finding of disability based on mere subjective complaints would open the Plan up to malingering and would greatly hamper [the insurance company] from exercising its fiduciary role of scrutinizing requests for benefits."  *Bratton v. Metropolitan Life Ins. Co.*, 439 F. Supp. 2d 1039, 1052 (C.D. Cal. 2006.)

Though decided in the Central District, the above case law provides a lens through which to

**UNITED STATES DISTRICT COURT**
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

view LINA's consideration of Plaintiff's own reports of her disability, which LINA did, in fact, consider. In Plaintiff's file, her claim manager documented her reports of pain following phone interviews and file reviews. (AR 16, 32, 42.) The January 17, 2007 and May 15, 2007 denial letters sent to Plaintiff discuss her disability questionnaire in which Plaintiff documented her symptoms, pain, and limitations. (AR 165, 260.) Additionally, in his deposition, Mr. Lodi discussed how claims managers review the disability questionnaires submitted by the claimants, as well as statements from coworkers or friends that speak to the functionality of the claimant, and consider them during review, although the subjective assessments are not considered "medical evidence." (Lodi Deposition 15:14-17:10, Dkt. #65.)

Accordingly, the undersigned finds that LINA did consider Plaintiff's self-reports of disability, but rather than relying on them exclusively, which could "open the Plan up to malingering[,]" LINA relied primarily on the reports of Plaintiff's physicians which indicated that her restrictions and limitations did not prevent her from performing the duties of her occupation. *Bratton*, 439 F. Supp. 2d at 1052. Thus, this factor will have no bearing on the level of deference accorded to LINA's benefit determination.

g.    *Plaintiff's Argument that LINA Denies all Claims Based Upon Pain*

In her supplemental brief, Plaintiff states that her medical condition causes pain, and it was pain that caused her to leave her job. (Pl.'s Supp. Br. 2:5-8, Dkt. #58.) Plaintiff notes that LINA evaluates whether the claimant has restrictions or limitations which would prevent the claimant from working, and states that LINA defines "limitation" as something inherently measurable. *Id.* at 2:11-3:3. Plaintiff extracts this definition from another case involving LINA in which counsel for Plaintiff was also involved: "I attach as exhibit 12 a definition of 'limitation' which I received as part of LINA's initial disclosures in the case of Wiles v. Adventist Health Systems West Long Term Disability Plan, USDC Northern District of California, No.C09-01952 SI." (Padway Decl. ¶ 12, Ex. 12, Dkt. #65.) Plaintiff contends that "[b]ecause pain cannot be measured, LINA excludes it from consideration and LINA systematically wrongfully denies claims where the insured's work limitation, as here, arises from pain." (Pl.'s Supp. Br. 3:4-5, Dkt. #58.) Plaintiff states that LINA

UNITED STATES DISTRICT COURT
For the Northern District of California

does not have any manual or guideline that identifies "objective measurements of impairment due to pain which [LINA] has accepted [in the past] to prove pain sufficient to result in work disability."[15] *Id.* at 4:9-12.

In response, Defendants contend that Plaintiff offers no evidence of such systematic denials, because none exist. (Defs.' Supp. Br. 2:23-3:1, Dkt. #67.) Defendants further argue that Plaintiff offers no evidence of any claims denied by LINA because there were no objective measurements of pain. *Id.* at 3:7-8.

Plaintiff argues that the testimony of Mr. Poliziani proves that LINA rejects work limitations caused by pain. (Pl.'s Supp. Br. 4:8-9, Dkt. #58.) The undersigned disagrees. When asked what LINA looks for in analyzing whether a claimant has too much pain to work, Mr. Poliziani answered that "[t]here are a myriad of physical findings and testings that can document impairment and pain." (Padway Decl., Ex. 9[16], 28:18-29:3, Dkt. #65.) When questioned as to what documentation Mr. Poliziani had accepted in the past to document impairment based on pain, Mr. Poliziani testified that he had accepted physician records, nerve conduction tests, and physical therapy reports. *Id.* at 28:10-29:11. Furthermore, Plaintiff's contention that Mr. Poliziani's failure to answer questions regarding documentation which would have supported an objective finding of pain equates to LINA systematically denying benefits for limitations based on pain is totally unavailing and highlights Plaintiff's failure to offer any real evidence in support of her position on the structural conflict of interest. (Pl.'s Supp. Br. 3:4-4:8, Dkt. #58.) The following excerpt from Mr. Poliziani's deposition speaks for itself:

Mr. Padway:  You should feel free, by the way, in answering any of my questions to

---

[15]This is language from Plaintiff's Request for Production No. 5, which reads:  "Writings showing each of the different objective measurements of impairment due to pain which [LINA] has accepted to prove pain sufficient to result in work disability where the objective measurement of impairment is also accompanied by a medical diagnosis of a condition which is reasonably expected to cause significant pain, and the issue is whether the severity of pain is sufficient to be disabling." (Padway Decl., Ex. 2, 4:21-5:12, Dkt. #59.)  After objecting, Defendants in their response contend that "they do not possess any documents that are responsive to this request." *Id.*

[16]Hereinafter, "Poliziani Deposition".

refer to any records that might be useful to you. I'm not intending to test your memory. So if you want to refer to the claim file, you should feel free to do so.
Ms. Publicover: Do you have a copy of the claim file available to the witness?
Mr. Padway: Sure, I'll just fly right over with it.
Ms. Publicover: Normally if you're going to ask a witness questions about documents, you would make those documents available to the witness. The witness told you that he brought no documents with him here today.
Mr. Padway: Well, thank you for that bit of procedural information.
Ms. Publicover: I'm not going to allow you to unduly prejudice my witness by suggesting that he has the right and opportunity to review documents that you have not provided to him and that you know he did not bring with him here today.
Mr. Padway: Well, I'm not responsible for preparing the witness for a deposition.
Ms. Publicover: Well, if you wanted the witness to testify from documents, you should have provided those documents to him today or asked that he bring them here with him and you have done neither, so I just want the record to be clear.
Mr. Padway: Are you finished?

(Poliziani Deposition 16:17-17:25, Dkt. #65.)

The administrative record in this matter shows that LINA took into consideration Plaintiff's self-reports of disability, including the pain that she reported she was suffering. Mr. Poliziani testified, without any documentation provided to him, that LINA accepts documentation from claimants' physicians and physical therapists in order to determine what effect the claimants pain has on their ability to work. Thus, Plaintiff has failed to produce any evidence which shows that LINA denies claims which arise out of limitations that are pain-based. Accordingly, the undersigned finds that LINA does not systematically deny claims based on pain, and thus this factor will have no effect on the abuse of discretion standard.

> h.    *Whether LINA Employees Have a Financial Incentive to Deny Claims*

Plaintiff claims that "LINA fails to insulate claims decision makers from the corporate need for profit." (Pl.'s Supp. Br. 10:21-22, Dkt. #58.) Plaintiff contends that LINA employees are offered a 401k plan, and that one of the investment choices is stock in the company. *Id.* at 10:23-24. Plaintiff maintains that senior executives, "some of whom presumably have oversight of disability claims, are offered bonuses payable in company stock." *Id.* at 10:25-26. Plaintiff further maintains that Mr. Poliziani, Plaintiff's own claim manager, participates in the 401k plan, but was unaware of whether CIGNA stock was among his investments. *Id.* at 11:1-3.

In response, Defendants contend that there is no evidence that the option to purchase or

UNITED STATES DISTRICT COURT
For the Northern District of California

holding of CIGNA stock improperly affected the decision to deny Plaintiff LTD benefits.  (Defs.'
Supp. Br. 12:21-22, Dkt. #67.)  To the contrary, Defendants argue that there is substantial evidence
which shows that LINA's employees have no financial incentive to deny LTD claims.  *Id.* at 13:1-2.

In her declaration, Ms. Hong, a senior operations representative with LINA, states that LINA
employees who make decisions regarding claims made by Plan participants are paid fixed salaries,
wholly unrelated to the number of claims they either pay or deny.  (Hong Decl. ¶¶ 1, 5, Dkt. #44-2.)
Additionally, those who manage LINA's finances are walled-off from those in the claim department
and appeals unit.  *Id.* at ¶ 11.  The claim department and appeal unit are located in different cities
than the financial underwriters, do not seek approval from the underwriters when making claim
decisions, and are not influenced by the underwriters with respect to claim decisions.  *Id.* at ¶¶ 11-
12.  No one in the office of LINA's Chief Financial Officer have any involvement in claim
decisions.  *Id.* at ¶ 13.  In conjunction with the *Mattox* case, Mr. Lodi testified to the same effect.
*Mattox*, 2009 U.S. Dist. LEXIS 88061, at *12.  Lodi testified there that individuals making claim
decisions are not provided benefits, bonuses, commissions, promotions, or any other financially-
based incentives related to approval or denial of claims.  *Id.*  The court there quoted his testimony:

> No case manager gets more money, better compensation, recognition of any type for
> denying claims or for approving claims.  It's the management of the claims in a timely
> fashion that can get them that recognition . . . . No one, nothing is driven by the
> number of decisions or the number of denials or approvals that anyone makes.

*Id.*  In his deposition in this matter, Mr. Lodi testified to his belief that only senior executives could
receive stock options.  (Lodi Deposition 57:15-18, Dkt. #65.)  Based on the foregoing, it appears that
no one related to Plaintiff's claim had any financial incentive to deny her claims.  Those who
handled her claim are salaried employees with no stock options or bonus options for denial of
claims.  Accordingly, the undersigned finds that LINA employees have no financial incentive to
deny claims, and thus, this factor will not bear on the abuse of discretion review.

### i. Summary

The undersigned has analyzed each argument put forth by Plaintiff in furtherance of her
contention that LINA's structural conflict of interest had an effect on the handling and denial of her

39

UNITED STATES DISTRICT COURT
For the Northern District of California

claim.  After thorough reasoning of each party's argument regarding each factor, the undersigned arrived at the conclusion that no factor evinced an impropriety and that LINA's conflict of interest should not serve to temper the abuse of discretion review with skepticism.  Viewed in the light most favorable to Plaintiff, analysis of each factor shows that there is no evidence, and thus, no triable issue of fact, as to whether the structural conflict of interest had an improper motivation on the insurer's decision to deny benefits.  *Nolan*, 551 F.3d 1148, 1154; *Montour*, 588 F.3d at 637. Plaintiff has presented no evidence that LINA "provides inconsistent reasons for denial, fails adequately to investigate a claim or ask the plaintiff for necessary evidence, fails to credit a claimant's reliable evidence, or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record."  *Abatie*, 458 F.3d at 968-69 (internal citations omitted).  Just the opposite, in fact.  The evidence shows that the conflict of interest is "unaccompanied . . . by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history."  *Id.* at 968.  Thus, the level of skepticism with which the Court should view the decision to deny benefits must be low.  *Id.*

Accordingly, the undersigned will analyze LINA's decision to deny Plaintiff LTD benefits with a low level of skepticism.

**C.    Plaintiff's Request for Additional Discovery**

As previously mentioned, Judge Walker issued an order finding that Plaintiff was entitled to conduct limited discovery into whether LINA's structural conflict of interest affected the denial of LTD benefits, and ordered the parties to submit supplemental briefing relating to how, if at all, LINA's structural conflict of interest should affect the Court's standard of review.  (*Order* 3:5-6, 9:3-8, Dkt. #53.)

In response, Plaintiff propounded discovery regarding LINA's structural conflict, then filed a letter brief requesting additional discovery.  (Dkt. #56.)  The additional information sought by Plaintiff is LINA's online policy and procedure manual which was testified to in the above-mentioned depositions and which counsel notes he has copies of from other counsel, and production of a witness knowledgeable about statistics regarding LINA's rate of claims denial.  (Dkt. #56.)

UNITED STATES DISTRICT COURT
For the Northern District of California

Defendants contend that LINA's internal guidelines generally address how to calculate a benefit and how to handle a change of address, and are not relevant in determining whether the conflict of interest affected the decision to deny Plaintiff LTD benefits.  (Defs.' Discovery Br. 1:18-23, Dkt. #70.)  Defendants further argue that the procedures do not offer guidelines on how to analyze medical information or when to pay or deny claims.  *Id.* at 1:24-26.  Regarding the witness issue, Defendants claim that, after Judge Walker issued the order permitting discovery, Plaintiff noticed a deposition for the person most knowledgeable as to five listed topics, and "rate of claims denial" was not one of those topics.  *Id.* at 4:15-21.  In response to Plaintiff's notice, Defendants produced Mr. Lodi.  *Id.* at 4:20-21.

Courts have discretion to permit discovery into the nature, effect and extent of the structural conflict of interest, but such discovery must be narrowly tailored and not a fishing expedition. *Stephan v. Thomas Weisel Partners, LLC*, No. C 08-01935 MHP, 2009 WL 2511973, at *9 (N.D. Cal. 2009.)  Only "when a claims administrator expressly cites an internal document and treats that document as the equivalent of plan language in ruling on a participant's entitlement to benefits" must the plan disclose that internal document.  *Mondry v. American Family Mutual Ins. Co.*, 557 F.3d 781, 801 (7th Cir. 2009); *see also Kroll v. Kaiser Found. Health Plan Long Term Disability Plan*, No. C 09-01404 JSW, 2009 WL 3415678, at *2-3 (N.D. Cal. 2009) (the plaintiff was only entitled to discover those portions of insurer's internal guidelines which were relied upon in making her specific claim determination.)

The supplemental briefs, discussed at length above, reflect that Plaintiff deposed two LINA employees, Mr. Lodi and Mr. Poliziani, regarding the conflict of interest.  (Padway Decl., Exs. 8, 9, Dkt. #65.)  Mr. Lodi was produced to testify pursuant to the structural conflict of interest and the topics noticed by counsel for Plaintiff.  When asked "[d]oes the company keep track of the percentage of claims that are granted versus denied?"  Mr. Lodi answered: "[n]o."  (Lodi Deposition 35:6-8, Dkt. #65.)  Additionally, the undersigned is unable to discern how information regarding the number of claims denied versus granted is relevant to case at bar, especially in light of a finding that Plaintiff has offered no proof that the structural conflict of interest affected the decision to deny her

benefits. Further, Plaintiff has failed to show how LINA's policies and procedures are relevant to the structural conflict of interest, and has offered no evidence to support an argument that LINA relied on its internal policies in making Plaintiff's benefit determination. It is quite clear that the Policy was the operative document relied upon in making decisions regarding Plaintiff's claim, and it is quoted verbatim in each of her denial letters. (*See* LINA 105-127; AR 129-30, 164, 259-60.) Finally, the undersigned has already determined that the structural conflict of interest did not bear on LINA's decision to deny Plaintiff's claim for LTD benefits. Accordingly, the undersigned RECOMMENDS that the Court DENY Plaintiff's request for additional discovery.

**D.      Plaintiff's Offer of Additional Evidence Outside the Administrative Record**

As previously discussed, Plaintiff contends that she was totally disabled throughout the Elimination Period, but states that the administrative record does not contain all of the disability slips which would support this finding. (Pl.'s Reply Br. 4:3-17, Dkt. #45.) Plaintiff offers 23 additional documents attached to a declaration, stating that Hertz told her to send the attached forms to human resources, and that she sent three copies of each form to Hertz. (Munn Decl. ¶ 3, Dkt. #46.) Plaintiff states that LINA did not ask her to send them the forms, and she assumed Hertz would forward them to LINA. *Id.* The forms attached to Plaintiff's declaration were illegible, and she resubmitted 20 of them. (Dkt. #52.)

In response, Defendants argue that the Court should not consider these additional records. (Defs.' Reply Br. 6:13-16, Dkt. #47.) Specifically, Defendants contend as follows: (1) the Court's review of LINA's decision to deny benefits is limited to the administrative record when abuse of discretion is the standard of review; (2) there was no procedural irregularity which prevented the full development of the record, and thus Plaintiff should not be allowed to submit new evidence; (3) Plaintiff could and should have provided this information to LINA during the administrative process, and prejudiced LINA by failing to do so; and (4) the additional records fail to support a finding of total and continuous disability throughout the Elimination Period. *Id.* at 6:17-18, 7:8-9, 7:19-20, 8:9-10, 9:10-15.

///

UNITED STATES DISTRICT COURT
For the Northern District of California

1    1.    Legal Standard

2        District courts are limited to a review of the administrative record in abuse of discretion

3    cases, plus evidence submitted which bears on the insurer's structural conflict of interest. *Abatie*,

4    458 F.3d at 969-70.  Only where there has been a procedural irregularity, such as the addition of a

5    new reason for denial in the final appeal letter, may the insured present new evidence outside the

6    administrative record. *Saffon*, 522 F.3d at 872.

7        2.    Application to the Case at Bar

8        Plaintiff argues that the Plan took inconsistent positions in denying her claim for benefits,

9    and thus that she should be entitled to supplement the administrative record.  (Pl.'s Reply Br. 2:4-10,

10   3:8-11, Dkt. #45.)  Specifically, Plaintiff argues that during the administrative process, the Plan

11   relied solely on the Medical Director's review of Plaintiff's file and the decision that there were not

12   significant findings to support disability, and in their motion, the Plan does not rely on the Medical

13   Director at all but rather argues that Plaintiff's treating physicians failed to document restrictions

14   and limitations sufficient for a finding of disability during the Elimination Period.  *Id.* at 2:3-13.

15   Based upon this alleged inconsistency, Plaintiff contends that she is faced with a new reason for

16   denying benefits and should be entitled to supplement the administrative record.  *Id.* at 5:1-5.

17   Plaintiff maintains that she was unaware that there was only a single disability slip in the

18   administrative records because she was not involved in obtaining records from Kaiser.  *Id.* at 4:8-10.

19   The slip Plaintiff refers to is one from Dr. Mizock, which notes that Plaintiff is able to stand for up

20   to three hours daily, that she can lift or carry up to twenty-five pounds on an occasional basis, and

21   that she can bend, squat, kneel, climb, reach above her shoulders, and perform repetitive hand

22   motions on occasion.  (AR 254.)  On this note, dated October 17, 2006, Dr. Mizock writes that

23   Plaintiff is able to return to work on modified duty on November 18, 2006.  (AR 254.)  Plaintiff

24   argues that she sent copies of the additional slips she is now offering to Hertz, but does not state

25   when she sent these to Hertz.  (Pl.'s Reply Br. 4:14-16, Dkt. #45.)

26       As laid out above, Defendants offer four reasons why the Court should not consider the

27   additional evidence offered by Plaintiff.  Defendants contend that "Plaintiff's belated production of

28

additional medical information is not admissible when determining whether LINA's claims

determination based on the administrative record (which did not contain this information) was

reasonable or correct." (Defs.' Reply Br. 7:15-18, Dkt. #47.)  Defendants maintain that Plaintiff

should and could have provided the documentation she is now offering, and contest her argument

that she had no knowledge that LINA had only one disability slip in the file.  *Id.* at 7:19-23.

Defendants note that it was Plaintiff who provided this disability slip to LINA in conjunction with

her first appeal and that she prejudiced LINA by failing to produce the others.  *Id.* at 7:24-8:10.

          The undersigned agrees with Defendants.  Plaintiff has failed to show that there was a

procedural irregularity which prevented her from submitting all information pertinent to her claim.

Plaintiff's argument that LINA relied solely on the Medical Director's review in denying her appeal,

and that this position is inconsistent with the position taken in Defendants' motion for judgment, that

Plaintiff failed to document restrictions and limitations which would prevent her from performing

her job duties, is incorrect, as a review of the pertinent documents reveals.  (Pl.'s Reply Br. 2:4-8,

Dkt. #45.)  As discussed in previous sections, in each denial letter sent to Plaintiff, she was told that

the medical evidence did not support a finding that she had sufficient restrictions and limitations to

render her totally disabled throughout the Elimination Period.  (AR 129-31, 164-68, 259-61.)  The

final denial letter states that LINA's Medical Director reviewed Plaintiff's entire file, and that his

findings were the same as the original denials—insufficient evidence to support a finding of no work

throughout the requisite time period.  (AR 130.)  In their motion for judgment, Defendants

continuously state that the reason behind the denial of benefits is that the records submitted did not

support that Plaintiff was continuously disabled throughout the Elimination Period.  (Defs.' Mot.

1:13-17, 12:24-27, 13:24-14:2, 15:4-7, 16:6-8, 16:22-17:8, Dkt. #40.)  Accordingly, the undersigned

finds that Defendants did not offer inconsistent reasons for denial, and that no procedural irregularity

existed which would prevent Plaintiff from submitting all pertinent medical records.

          Even if the undersigned found such a procedural irregularity, the additional medical records

do not support Plaintiff's contention that she was continuously disabled throughout the Elimination

Period.  In fact, notes from Drs. Sinclair and Mizock state that Plaintiff could return to work on

UNITED STATES DISTRICT COURT
For the Northern District of California

1    modified duty beginning July 18, 2006, a date which falls during the Elimination Period.  (Munn

2    Decl., Dkt. ## 46, 52.)  Thus, these records, were the undersigned to include them in reviewing the

3    administrative record and the decision to deny benefits, would not assist Plaintiff in making her case.

4    Accordingly, the additional records offered by Plaintiff will not be considered.

5    **E.    Cross-Motions For Judgment**

6        In their motion for judgment or alternatively, for summary judgment, Defendants argue that

7    LINA's determination that Plaintiff was not entitled to LTD benefits under the Plan was reasonable

8    and not clearly erroneous.  (Defs.' Mot. 1:13-15, Dkt. #40.)  Defendants contend that the records

9    submitted by Plaintiff's treating doctors do not establish that she was continuously disabled during

10   the key time at issue, and thus that LINA's decision was proper.  *Id.* at 1:15-19.  Finally, Defendants

11   argue that summary judgment is proper as to Plaintiff's breach of fiduciary duty claim, arguing that

12   all of Plaintiff's evidence in support of this claim is inadmissible.  *Id.* at 1:20-24.

13       In response[17], Plaintiff argues that she is entitled to LTD benefits under ERISA for several

14   reasons.  First, Plaintiff contends that the Plan's denial letters failed to provide her with a description

15   of any additional information which would have enabled her to succeed on her claim.  (Pl.'s Reply

16   Br. 1:12-14, Dkt. #45.)  Next, Plaintiff argues that the Plan took inconsistent positions in the denial

17   of benefits and the motion for judgment, and thus that the decision to deny benefits was affected by

18   the Plan's self-interest.  *Id.* at 2:27-3:1.  Next, Plaintiff maintains that she was, in fact, totally

19   disabled during the Elimination Period, but that the Plan did not have all of the "disability slips"

20   which would support that finding.  *Id.* at 4:3-17.  Plaintiff offers a declaration and attaches to it

21   disability slips which she argues cover the entire period of her pre-surgery disability.  (Dkt. #46;

22   Pl.'s Reply Br. 4:16-17, Dkt. #45.)

23       Additionally, Plaintiff contends that LINA breached its fiduciary duty under ERISA when,

24   during settlement negotiations, it required her to sign a release of claims which she contends is

25   _____

26       [17]Plaintiff did not file an opposition to Defendants' motion for judgment.  Rather, Plaintiff
     filed what the Court construes to be a cross-motion for judgment, and responded to certain of
27   Defendants' arguments in that motion and in her reply in support of her cross-motion for judgment.

28

"overbearing" and benefits LINA at the expense of the beneficiary.  (Pl.'s Reply Br. 7:11-12:1, Dkt. #45.)   Finally, Plaintiff argues that LINA has discriminated against her for exercising her right to bring suit under ERISA.  *Id.* at 12:14-16.  Plaintiff asserts that LINA acted discriminatorily under ERISA by use of its claims release form during settlement negotiations.  *Id.* at 13:7-12.

In their reply, Defendants maintain that the administrative record supports the denial of Plaintiff's claim for LTD benefits because it shows that none of Plaintiff's medical conditions continuously disabled her throughout the Elimination Period.  (Defs.' Reply Br. 1:2-3, 1:14-16, Dkt. #47.)  Defendants contend that Plaintiff provided no evidence of bias or procedural irregularity in the handling of her claim, and that her attempt to submit documentation outside of the administrative record and at the last minute should be rejected.  *Id.* at 1:7-20.

### 1.   Legal Standard

A beneficiary or plan participant may sue in federal court under ERISA "to recover benefits due to him [or her] under the terms of his [or her] plan, to enforce his [or her] rights under the terms of the plan, or to clarify his [or her] rights to future benefits under the terms of the plan . . . ."  29 U.S.C. § 1132(a)(1)(B).  The district court will review the denial of benefits for an abuse of discretion.  *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 959 (9th Cir. 2006).

"An ERISA administrator abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact."  *Boyd v. Bert Bell/Pete Rozelle NFL Players Retirement Plan,* 410 F.3d 1173, 1178 (9th Cir. 2005).   A finding is "clearly erroneous" when even though there is evidence to support it, the reviewing court "on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *Id.* (internal quotations omitted).  Thus, a court must "uphold the decision of an ERISA plan administrator if it is based upon a reasonable interpretation of the plan's terms and was made in good faith."  *Id.* (internal quotations omitted.)

### 2.   Whether LINA Abused its Discretion

Defendants argue that LINA, the claims administrator for the Plan, did not abuse its

46

discretion in denying Plaintiff LTD benefits. (Defs.' Mot. 12:24-25, Dkt. #40.) Defendants claim that Plaintiff was informed that her claim was being denied because the medical information she and her care providers submitted did not support restrictions and limitations that prevented her from performing her regular occupation throughout the Elimination Period. *Id.* at 12:25-27. Defendants maintain that even when LINA's structural conflict of interest is taken into consideration, the decision to deny benefits is reasonable based on the information in the administrative record. *Id.* at 13:24-14:2. Defendants contend that LINA relied largely on the information provided by Plaintiff's treating providers, did not improperly construe any provision of the Policy, and did not rely on any "clearly erroneous" findings of fact, and thus that LINA's decision to deny benefits should be upheld. *Id.* at 13-1:3.

Plaintiff maintains in her motion and her reply that the Plan acted erroneously when it denied her claim for benefits. In her motion, Plaintiff argues that the Plan did not provide a specific reason for rejecting her claim, and also failed to comply with the requirement that a doctor registered or certified in California review her claim.[18] (Pl.'s Mot. 6:18-7:22, Dkt. #43.) Specifically, Plaintiff argues that the denial letters sent to her did not instruct her in lay terms as to what additional information was necessary for her to perfect her claim. *Id.* at 9:4-6. In her reply, beyond asserting the above arguments, Plaintiff contends that the Plan took inconsistent positions during the administrative process and in its motion for judgment. (Pl.'s Reply Br. 2:3-13, Dkt. #45.) Specifically, Plaintiff argues that during the administrative process, the Plan relied solely on the Medical Director's review of Plaintiff's file and the decision that there were not significant findings to support disability, and in their motion, the Plan does not rely on the Medical Director at all but rather argues that Plaintiff's treating physicians failed to document restrictions and limitations sufficient for a finding of disability during the Elimination Period. *Id.* Plaintiff contends that the latter argument "fails as a matter of law [and] human biology . . . ." *Id.*

---

[18]It appears to the undersigned that Plaintiff argues the above were both clearly erroneous, although she does not state that specifically.

UNITED STATES DISTRICT COURT
For the Northern District of California

In their reply brief, Defendants contend that "LINA's determination that plaintiff was not disabled from her regular occupation throughout the Elimination Period is not a position asserted by LINA for the first time during this litigation." (Defs.' Reply Br. 3:1-3, Dkt. #47.)  Specifically, Defendants point to the May 15, 2007 denial letter, which provides: "In order to be eligible for [LTD] benefits we need objective findings which support your inability to perform the material duties of your Regular Occupation through the above mentioned Benefit Waiting Period."  (AR 165.)  The letter continues: "In reviewing your claim we need clinical documentation which supports a no work restriction for the period of May 21, 2006 through November 18, 2006 which represents the Benefit Waiting Period as outlined in your policy."  *Id.*  The letter then discusses all of the documentation received as of that time.  (AR 165-67.)

        a.     *Legal Standard*

"The clearly erroneous standard does not permit the overturning of a decision where there is substantial evidence to support the decision, that is, where there is relevant evidence that reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence."  *Troutman v. Unum Life Ins. Co. of Am.*, C 04-0889 MMC, 2008 WL 2757082, at *8 (N.D. Cal., July 14, 2008) (citing *Snow v. Standard Life Ins. Co.*, 87 F.3d 327, 331-32 (9th Cir. 1996) (internal quotations omitted)).  Beyond the effect of the structural conflict of interest, other factors to consider under an abuse of discretion review "include the quality and quantity of the medical evidence, whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records, whether the administrator provided its independent experts with all of the relevant evidence, and whether the administrator considered a contrary SSA disability determination, if any."  *Montour*, 588 F.3d at 630.

        b.     *Application to the Case at Bar*

Each argument asserted by Plaintiff in support of her motion for judgment, or in her opposition to Defendants' motion for judgment, has already been addressed by the undersigned in the analysis above.  Plaintiff argues that LINA provided no specific reason for denying her claim,

that the denial letters were boilerplate, that they did not comply with ERISA standards which require LINA to inform Plaintiff of the specific reasons for denial, and that LINA does not have meaningful standards by which to assess claims.  (Pl.'s Mot. 6:17-19, 8:16-9:7, 10:1-3, 10:26-11:2, Dkt. #43.) The undersigned previously found that LINA complied with ERISA requirements to communicate clearly with Plaintiff, that the denial letters constituted an informative and meaningful dialogue between insurer and insured, that Plaintiff was repeatedly informed of the specific reasons her claim was being denied, and that LINA followed its claim handling procedures.  (*See* Conflict of Interest section above.)  Accordingly, none of these reasons amount to a finding that LINA abused its discretion in denying Plaintiff's claim for benefits.

In her reply, and in addition to the arguments in her motion, Plaintiff contends that LINA took inconsistent positions in denying her claim and in the motion for judgment, appearing to argue that this inconsistency equates to an abuse of discretion.  (Pl.'s Reply Br. 2:4-3:11, Dkt. #45.) However, in determining whether to admit additional evidence offered by Plaintiff, the undersigned found that LINA did not offer inconsistent reasons for denying Plaintiff's claim, and thus, this cannot lead to a finding of abuse of discretion.  (*See* Offer of Additional Evidence section.)  Plaintiff maintains in her reply that the undersigned's review of the denial of benefits should be "strongly informed by [LINA's] structural conflict of interest . . . ."  *Id.* at 5:26-6:19.  However, the undersigned carefully analyzed each argument offered by Plaintiff regarding LINA's alleged structural conflict of interest and found that the structural conflict of interest had no affect on LINA's decision to deny Plaintiff's claim for benefits.  (*See* Conflict of Interest section, subsection i.)  Accordingly, the structural conflict of interest will not influence the undersigned to find that LINA abused its discretion.  Finally, Plaintiff contends that the undersigned should determine Plaintiff was disabled based on her statements of disability and Dr. Warbritton's report.  *Id.* at 5:7-19.

Defendants arguments, laid out throughout this Report and Recommendation, can be succinctly put:  Defendants contend that the administrative record supports LINA's decision to deny Plaintiff's claim for benefits because the evidence shows that Plaintiff was not continuously disabled

throughout the Elimination Period.  (Defs.' Reply Br. 1:2-6, 1:12-16, Dkt. #47.)

The undersigned will review the administrative record and LINA's decision to deny Plaintiff's claim for benefits to determine whether LINA has abused its discretion.  A finding that LINA has: (1) rendered a decision without explanation; (2) construed Plan provisions in a manner which conflicts with the Plan's plain language; or (3) relied on clearly erroneous findings of fact, will compel the undersigned to find that LINA abused its discretion.  *Boyd,* 410 F.3d at 1178. Accordingly, the undersigned will uphold LINA's decision to deny benefits if LINA made a reasonable interpretation of the Plan's terms and denied Plaintiff's claim in good faith.  *Id.*

LINA made its first decision to deny Plaintiff's claim for benefits on January 17, 2007.  (AR 259-61.)  As discussed above, Plaintiff was required under the Policy to provide satisfactory evidence that she was continuously disabled throughout the 26-week Elimination Period, meaning that, due solely to injury or sickness, she was unable to perform the material duties of her regular occupation.  (LINA 108, 115.)  Plaintiff was informed of these requirements in the January 17 letter.[19]  (AR 259-61.)  The documentation in LINA's possession when it first decided to deny Plaintiff's claim for benefits consisted of Plaintiff's own disability questionnaire and Dr. Williams' PAA form.  (AR 260[20].)  On her disability questionnaire, Plaintiff stated that she could not work due to right foot pain, lower back pain, and left hand pain.  (AR 342.)  Plaintiff stated that she could not walk or stand for extended periods based upon this pain.  *Id.*  As discussed, LINA sent multiple letters and faxes to each doctor identified by Plaintiff seeking her medical records, restrictions and limitations, and also sent Plaintiff a letter indicating the information needed.  (AR 260, 337.)  LINA received only one response, from Dr. Williams.  (AR 32, 260, 263.)  The form completed by Dr. Williams, Plaintiff's treating podiatrist, dated January 4, 2007, diagnosed Plaintiff with Hallux Valgus and Type II Diabetes, and stated that she could sit and stand for five and a half plus hours per

---

[19]In its initial denial letter, LINA informed Plaintiff that any additional records she planned to submit should cover the period of May 2006 through the present.  (AR 261.)

[20]The denial letter states that the only completed PAA received was from Dr. Sinclair, but LINA's internal notes correctly state that it was from Dr. Williams.  (AR 32, 260.)

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1    day, that she could climb and balance, and that she could use her lower extremities for foot controls

2    anywhere from occasionally to continuously. (AR 263-64.) In reviewing the information submitted,

3    LINA's claim manager noted that Plaintiff's symptoms of toe pain were consistent with Dr.

4    Williams' diagnosis, that he documented no restrictions for Plaintiff, and that "the only medical

5    provided is PAA which Does not restrict claimant for performing light work . . . ." (AR 32.)

6        The undersigned finds that LINA relied on Plaintiff's own statements of disability as well as

7    the form submitted by her treating physician and, in accordance with the plain language of the

8    Policy, arrived at the decision that Plaintiff be denied benefits "as medical does not support

9    [claimant] not being able to perform material duties of own occupation." (AR 32.) In rendering its

10   decision, LINA clearly explained to Plaintiff that it had attempted to secure medical information

11   from her other physicians, but based upon what it had received, Plaintiff had not fulfilled her

12   obligation to show that she was disabled under the Plan. (AR 259-61.) Accordingly, the first denial

13   of Plaintiff's claim was based upon a reasonable interpretation of the Plan's terms and made in good

14   faith, and therefore, was not clearly erroneous.

15       Plaintiff appealed the denial of her claim on March 2, 2007. (AR 256-57.) In her letter,

16   Plaintiff stated that she met the Plan's definition of disability, that she was continuously disabled as

17   required, and that she believed she was entitled to benefits. *Id.* Along with her letter, Plaintiff

18   provided a copy of a disability slip from Dr. Mizock from her October 17, 2006 office visit. (AR

19   254, 256.) The form noted that Plaintiff could carry up to twenty-five pounds on occasion, bend,

20   squat, kneel, climb, reach above her shoulders, and perform repetitive hand motions. (AR 254.) Dr.

21   Mizock noted that Plaintiff could sit for fifteen minutes per hour and stand or walk for a total of

22   three hours during each eight-hour workday. *Id.* Dr. Mizock noted that Plaintiff could return to

23   work on modified duty on November 18, 2006 (the final day of the Elimination Period.) *Id.*

24   Plaintiff's physicians also submitted additional medical documentation. (AR 177-250.)

25       The additional documentation, catalogued by LINA in its second denial letter, is as follows.

26   (AR 165-67.) Dr. Sinclair provided an office note, dated May 23, 2006, where he lists that Plaintiff

27   reported right foot pain for several weeks. (AR 214.) He notes that Plaintiff experienced pain to the

28

touch on the top of her right foot during the examination, and that she was waiting for arrival of a custom-made orthotic for her foot. *Id.* Dr. Sinclair noted that there were no signs of infections, swelling or redness, and advised Plaintiff to protect her foot with a shoe, not to bend her toes back, not to wear tight shoes, low heels or soft soles. *Id.* Dr. Sinclair put Plaintiff off work for one week. *Id.* This notes the first occurrence during the Elimination Period where Plaintiff was placed off work by one of her physicians based on her symptoms.

Dr. Mizock provided an office note dated May 30, 2006, documenting Plaintiff's left wrist pain. (AR 213.) It was at this visit that Dr. Mizock diagnosed Plaintiff with DeQuervain's Tenosynovitis, a wrist/hand condition. Though this visit was not mentioned in the second denial letter, it was considered by LINA in its review of the additional medical information submitted. (AR 132.) Dr. Mizock informed Plaintiff that she should use a splint if her symptoms became disabling, take anti-inflammatory medication, use ice, and rest. *Id.* Dr. Mizock did not put Plaintiff off work. *Id.*

Dr. Sinclair also provided an office note dated June 5, 2006 documenting Plaintiff's complaint of discomfort between the toes of her left foot. (AR 212.) Dr. Sinclair noted a callus on Plaintiff's fourth toe, which he planned to reduce. *Id.* Dr. Sinclair told Plaintiff to continue to use a post-operative shoe and not to work for one week. *Id.* It does not appear that Plaintiff was advised by Dr. Sinclair to remain off work from the first visit on May 23 until the June 5 visit, and as noted above, Dr. Mizock did not place Plaintiff off work at the May 30 visit.

Dr. Mizock also provided an office note dated June 12, 2006, documenting Plaintiff's active health problems. (AR 210.) Dr. Mizock noted that Plaintiff reported pain in her left wrist and that she was using a splint for her thumb and icing it, but was seeing little improvement. *Id.* Dr. Mizock also noted Plaintiff's complaint of numbness in the toes of her right foot. *Id.* Per Plaintiff's request, Dr. Mizock extended Plaintiff's time off from work for ten days to get her pain under control. (AR 211.)

Dr. Mizock also provided an office note dated August 9, 2006 which documented that Plaintiff's left wrist was improving with use of the splint. (AR 200.) Dr. Mizock also noted that

52

Plaintiff's right foot toe numbness was improving with use of shoes with a wide toe base, but that the shoes exacerbated Plaintiff's low back pain. *Id.* Following an exam, Dr. Mizock noted that Plaintiff's back had full range of motion with no tenderness, palpable spasm or pain on motion, and that her right foot revealed an absence of great toe flexion strength and subjective loss of sensation in that toe. *Id.* Dr. Mizock noted that Plaintiff requested an extension of time off work and work restrictions. *Id.*

Dr. Lai provided an office note dated August 17, 2006. (AR 196.) Dr. Lai noted that Plaintiff's exam revealed bliateral mild carpal tunnel syndrome but did not believe this to be the cause of Plaintiff's symptoms, and recommended a neurological exam to determine if the cause of Plaintiff's pain was neurological. *Id.* Dr. Lai did not order Plaintiff off work or recommend work restrictions. *Id.* Assuming Plaintiff's time off work extended until August 19 based on Dr. Mizock fulfilling her request for time off, there is again a gap during the Elimination Period where Plaintiff was ostensibly cleared to work without restrictions.

On August 26, 2006, Plaintiff underwent an MRI of her lumbar spine as ordered by Dr. Mizock. (AR 195.) The report notes that she has L3-4 and L4-L5 disc desiccation , minimal diffuse disc bulge at L4-5 without significant narrowing of the spine canal, but otherwise, no significant disc abnormalities. *Id.* The report notes no significant degenerative disc changes. *Id.*

Dr. Mizock also submitted an office note dated September 7, 2006, documenting that Dr. Mizock advised Plaintiff of the results of her MRI. (AR 192.) Dr. Mizock noted that Plaintiff needed an extension for her continued disability, that it currently was set to last through September 19, and that she would extend it through October 19, 2006, after which Plaintiff could return to work on modified duty. *Id.* As discussed above, there are no notes or records which appear to place Plaintiff off work between August 19 and September 19.

There is a treatment note from Dr. Lam dated September 13, 2006, in which Dr. Lam noted that Plaintiff's low back pain is not acute, severe, or disabling. (AR 229.) Dr. Lam noted that Plaintiff's pain is intermittent, and ordered an MRI. *Id.*

Dr. Mizock also submitted an office note dated October 17, 2006 which noted that, per her

UNITED STATES DISTRICT COURT
For the Northern District of California

physical therapist, Plaintiff needed additional time off work. (AR 190.) Following an exam, Dr. Mizock noted weakness and pain with extension of Plaintiff's left thumb. *Id.* In this note, Dr. Mizock mentions receiving a call from Plaintiff's therapist, Sherman Lam, who stated that Plaintiff was severely deconditioned and needed to remain off work for four weeks. *Id.* Dr. Mizock states that she would place Plaintiff off work until November 16, 2006, and that Plaintiff could return to working modified duty on November 17, 2006. *Id.*

Plaintiff's physicians also submitted several notes for office visits which occurred outside the Elimination Period. Dr. Mizock submitted an office note dated November 21, 2006, which documents a conversation regarding surgical options for Plaintiff's foot. (AR 187.) Plaintiff wanted to go ahead with surgery, but her podiatrist was out of the office, so Dr. Mizock noted that she encouraged Plaintiff to go ahead with the surgery with another doctor. *Id.*

Dr. Williams submitted a treatment note dated December 11, 2006, in which he states that Plaintiff is "a poor surgical candidate who most likely needs to quit wearing shoes that are too small and rub on her toes. . . . she says those aren't the cute kind." (AR 186.) Dr. Williams also noted that Plaintiff "gets pain in closed shoes especially on the callus over the 5th toe. But is basically pain free in sandals." *Id.*

Dr. Mizock also submitted a treatment note dated January 17, 2007, in which she documents a "frank discussion" with Plaintiff. (AR 183.) Dr. Mizock recommended that Plaintiff return to work as scheduled in mid-February, but noted that Plaintiff was very hesitant. *Id.* Plaintiff reported that she was not working even on modified duty and stated that her job did not want her back until she could work twelve hours a day and six days a week. *Id.* Dr. Mizock still recommended that Plaintiff return to work in mid-February. *Id.*

Dr. Mizock also submitted an office note dated February 2, 2007, which documents Plaintiff's complaints of low back pain for ten days with bending or lifting, with no radiation down the leg. (AR 182.) Plaintiff requested referral to a podiatrist for foot surgery. *Id.* Following exam, Dr. Mizock noted that Plaintiff had mild to moderate pain associated with her foot, that there was no tenderness or mass in her low back, but there was pain and a decreased range of motion. *Id.*

54

UNITED STATES DISTRICT COURT
For the Northern District of California

Jeff Weber, the nurse case manager assigned to Plaintiff's claim, reviewed each of the notes and records above and found that the documentation submitted did not support a finding that Plaintiff could not perform her job.  (AR 177-80.)  Based on the foregoing, the undersigned finds that the decision to deny Plaintiff's appeal was supported by substantial evidence.  Specifically, it appears that Plaintiff was not placed off work by any of her treating physicians between August 19 and September 19, and prior to that, she was placed off work for a period by Dr. Mizock at her own request.  Thus, LINA's finding that Plaintiff was not continuously disabled throughout the Elimination Period was not clearly erroneous.

Plaintiff appealed LINA's second denial of her claim on July 25, 2007 and, with her appeal, submitted the report of Dr. Warbritton.  (AR 162-63.)  As discussed at length above, LINA's medical director reviewed Plaintiff's entire file, including Dr. Warbritton's report, and concluded that Plaintiff's medical records did not support a finding that she was continuously disabled throughout the Elimination Period.  (AR 16, 134.)  The details of Dr. Warbitton's report are as follows.  On March 5, 2007, Dr. Warbritton's exam focused on Plaintiff's back and extremities.  (AR 141.)  Dr. Warbritton noted that Plaintiff was "presently temporarily totally disabled" at the time of his exam, which occurred outside the Elimination Period.  (AR 142.)  He went on to note that it was "premature to render" a definitive opinion about Plaintiff's occupational status, but that she "may require the supplemental job displacement benefit."  (AR 143.)

As to the causation of Plaintiff's foot, back and hand symptoms, Dr. Warbritton maintained:  "With regard to the right foot, it is my opinion that twenty-five percent of the permanent impairment that ultimately accrues will be the result of pre-existing nonindustrial medical conditions.  The remaining seventy-five percent of the permanent impairment will be the result of cumulative trauma continuing through May 20, 2006."  *Id.*  Dr. Warbritton's impression of Plaintiff's foot condition was "[h]allux valgus and metatarsus primus varus, right foot, pre-existing, aggravated by the subject cumulative trauma industrial injury described in this report . . . ."  (AR 154.)  The description of that condition can be summarized as a severe "crossed-toe" deformity.  (AR 152.)  Dr. Warbritton found that "[a]lthough the patient's underlying bunion is certainly partially nonindustrial, it is also related

to cumulative trauma at the work place continuing through May 20, 2006." (AR 155.)

As to Plaintiff's spine and wrist symptoms, Dr. Warbritton concluded that "one-hundred percent of the permanent impairment is not related to the patient's employment. Accordingly, zero percent of the impairment is due to any specific or cumulative industrial events." (AR 143.) Dr. Warbritton noted that the onset of Plaintiff's back pain did not occur until she had already been placed off work for her foot symptoms, and that "it is unlikely that the use of therapeutic footwear would cause the onset of spine symptoms." (AR 144.)

In discussing his findings, Dr. Warbritton stated that he "would reject the assertion that the degenerative disease in [Plaintiff's] left hand is in any manner related to her employment. It should be noted that [Plaintiff] did not perform repetitive manual activities or repetitive keyboard work with her left nondominant upper extremity . . . ." (AR 154.) He continued, "[t]herefore, there is insufficient evidence to support a cumulative trauma cause of action with regard to the left hand or upper extremities in this case." *Id.* Regarding Plaintiff's back symptoms, Dr. Warbritton stated in his report that he did not believe there had been compensable injury to Plaintiff's spine. *Id.* In his opinion, "[t]he patient exhibits evidence for some mild underlying degenerative disc disease with some vague pain that does not result in any ratable impairment, and does not result in the indications or necessity for medical treatment on an industrial basis." (AR 154-55.) "Accordingly, any impairment which may arise with regard to [Plaintiff's spine or hands] or need for medical treatment should be entirely self-procured and nonindustrial." (AR 156.)

Plaintiff argues that the undersigned should focus on Dr. Warbitton's report, as it is her belief that it, coupled with her own reports of disability, establish that she was disabled. (Pl.'s Reply Br. 5:7-12, Dkt. #45.) However, it is of particular consequence that Dr. Warbritton's report fails to even mention Plaintiff's restrictions and limitations during the Elimination Period. Accordingly, a thorough review of Plaintiff's entire file, including Dr. Warbritton's report, by LINA's medical director necessarily resulted in a finding that Plaintiff's claim should be denied. Because Plaintiff and her physicians could not offer medical records which showed that Plaintiff was continuously disabled throughout the Elimination Period, LINA's decision was not clearly erroneous.

UNITED STATES DISTRICT COURT
For the Northern District of California

Based on the foregoing, the undersigned RECOMMENDS that the District Court find that LINA did not abuse its discretion in denying Plaintiff's claim for benefits, and further RECOMMENDS that the Court GRANT Defendants' motion for summary judgment on Plaintiff's claim for LTD benefits.  Based on this finding, the undersigned also RECOMMENDS that the District Court DENY Plaintiff's cross-motion for judgment (Dkt. #43).

3.    Plaintiff's Breach of Fiduciary Duty Claim

In her FAC, Plaintiff claims that LINA breached the fiduciary duty owed to her under ERISA when LINA refused to enter into a settlement in this case unless Plaintiff agreed to sign a form settlement document in which she would be required to indemnify LINA against certain events, provide a release of the claim at issue as well as a general release of all claims against the Plan, LINA, the employer, and other related parties, never apply for any disability insurance from LINA or any CIGNA-affiliated underwriting company, to return all documents produced to Plaintiff by Defendants during the action, to agree that the prevailing party is entitled to fees in any litigation over the form settlement document, and to pay liquidated damages if Plaintiff facilitates any other lawsuit against the parties she releases from liability.  (FAC ¶ 14.)

In their motion for judgment, Defendants contend that Plaintiff's breach of fiduciary duty claim is legally defective for several reasons, and thus argue that summary judgment is proper. (Defs.' Mot. 1:20-24, 19:16-21, Dkt. #40.)  Defendants first argue that the claim is based on confidential settlement negotiations, which they maintain are inadmissible under Federal Rule of Evidence ("FRE") 408.  *Id.* at 19:22-24.  Next, Defendants argue that LINA was not acting as a fiduciary of the Plan when it engaged in settlement negotiations with Plaintiff.  *Id.* at 21:19-24. Regarding Plaintiff's argument that LINA discriminated against her, Defendants contend that Plaintiff's claim fails because she did not have a right to benefits under the Plan, nor did she have a right to settle.  *Id.* at 22:22-25.

In her reply, Plaintiff argues that LINA, as a fiduciary, used its position of trust to gain a personal advantage.  (Pl.'s Reply Br. 7:16-17, Dkt. #45.)  Plaintiff contends that the form settlement agreement benefits LINA at the expense of the Plan by requiring Plaintiff to indemnify LINA,

release claims against the Plan and related persons, and agree to never again become insured by LINA or any other CIGNA affiliated company. *Id.* at 8:17-9:11. Plaintiff further argues that the confidentiality clause in the form settlement agreement is overly broad and violates public policy in numerous respects. *Id.* at 11:20-26. Additionally, Plaintiff contends that she has been unlawfully discriminated against for exercising her right to file suit to collect benefits. *Id.* at 12:14-13:8. Plaintiff argues that she is entitled to an injunction proscribing further breaches of fiduciary duty, but concedes that "she may not gain monetary relief which is additional to that to which she is otherwise entitled . . . ." *Id.* at 12:9-11. Finally, Plaintiff contends that it is proper to bring a claim against LINA for breach of fiduciary duty, even though the alleged breach took place during confidential settlement discussions. *Id.* 13:16-25.

29 U.S.C. § 1002(21)(A) provides:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

Defendants contend that LINA was not acting as a plan fiduciary, as contemplated by the above section, in negotiating a settlement with Plaintiff, including when it provided Plaintiff with a copy of the proposed written settlement agreement. (Defs.' Mot. 21:19-20, 22:18-20, Dkt. #40.) Defendants argue that because Plaintiff's breach of fiduciary duty claim is not premised on either LINA's administration of or denial of her claim for benefits, Plaintiff cannot state a claim for breach of fiduciary duty. *Id.* at 21:20-23, 22:20-21.

In response, Plaintiff argues that Defendants' position "ignores reality." (Pl.'s Reply Br. 7:9-10, Dkt. #45.) Plaintiff contends that LINA was the only party participating in the mediation of this case, and that LINA would be the party obligated to pay any settlement reached. *Id.* at 7:10-11.

When the parties submitted briefs on the standard of review before Judge Walker,

58

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   Defendants submitted the Summary Plan Description ("SPD") for the Plan.  (Pirello Decl., Ex. A[21],

2   Dkt. #31.)  The SPD provides that the Plan Administrator, the Pension and Welfare Plan

3   Administration Committee, "supervises the operation of the Program and has the authority to

4   exercise discretion where necessary or appropriate in its administration and the interpretation of

5   Program provisions, and may delegate some responsibility to subcommittees, employees, third party

6   administrators or insurance companies."  (LINA 489.)  Modifications were made to the Plan

7   effective July 1, 2005, and subscribers were told to keep all updates with the SPD, which together

8   describe the provisions of the Plan.  (LINA 559.)  This modification appointed LINA as the Claim

9   Fiduciary of the LTD Plan, providing that LINA shall be responsible for adjudicating claims for

10  benefits under the Plan, and for making decisions regarding appeals of any adverse claim

11  determinations.  (LINA 565.)  Additionally, LINA was delegated the authority, in its discretion, to

12  interpret the terms of the Plan and Policies, to determine whether claimants are eligible for coverage

13  or benefits under the Plan, and to make any related findings of fact.  *Id.*  Finally, all decisions made

14  by LINA "shall be final and binding on Participants and Beneficiaries of the Plan to the full extent

15  permitted by law."  *Id.*

16          Defendants contend that this language shows that LINA was not authorized to act as a

17  fiduciary for the Plan when engaging in settlement negotiations with Plaintiff.  (Defs.' Mot. 22:17-

18  20, Dkt. #40.)  Pursuant to a reading of the plain language of 29 U.S.C. § 1002(21)(A), the

19  undersigned agrees with Defendants.  While LINA is acting as a fiduciary of the Plan to the extent

20  that it makes benefit determinations or decisions regarding appeals of benefit determinations, there

21  is no language in the SPD, its modifications, or in ERISA which establish that LINA was acting as a

22  fiduciary in conducting settlement negotiations.  LINA's authority does not include administration

23  of the Plan, and the Plan's Administrator, the Pension and Welfare Plan Administration Committee,

24  did not delegate such authority to LINA.  (LINA 489.)  Even had the Plan Administrator delegated

25

26          [21]The SPD comprises pages 379-509 of the administrative record and will hereinafter be
    referred to as if it were a continuation of Exhibit A to the Hong Declaration, i.e. "LINA 489".
27  Exhibits B through E to the Pirrello Declaration comprise pages 510-568 of the administrative
    record and will also be referred to as if continuing the Hong Declaration.
28

such authority to LINA, there is no legal support for Plaintiff's contention that making benefit determinations under the Plan equates to administration.  Accordingly, the undersigned finds that LINA was not acting as a Plan fiduciary when engaging in settlement negotiations with Plaintiff.  Thus, Plaintiff's breach of fiduciary duty claim must fail as a matter of law.

Furthermore, Plaintiff's breach of fiduciary claim is based on confidential and thus inadmissible settlement negotiations.  FRE 408 provides that conduct or statements made in compromise negotiations regarding the claim are not admissible to prove "liability for, invalidity of, or amount of a claim that was disputed as to validity or amount . . . ."  Here, Plaintiff is attempting to prove her claim, that LINA breached a fiduciary duty based on its conduct during settlement negotiations, with the conduct that occurred during settlement negotiations.  FRE 408 "is designed to ensure that parties may make offers during settlement negotiations without fear that those same offers will be used to establish liability should settlement efforts fail."  *Rhoades v. Avon Products, Inc.*, 504 F.3d 1151, 1161 (9th Cir. 2007); *see also Southwest Nurseries, LLC v. Florists Mut. Ins., Inc.*, 266 F. Supp. 2d 1253, 1256 (D. Colo. 2003) (finding that plaintiff was barred from filing a supplemental complaint where the new allegations arose out of conduct in the course of settlement negotiations and the new allegations would "necessarily implicate[ ] the policies underlying" FRE 408.)  Accordingly, Plaintiff's entire second cause of action for breach of fiduciary duty is barred.

Plaintiff also contends that LINA discriminated against her when she attempted to exercise her rights under ERISA.  (Pl.'s Reply Br. 12:6-15, Dkt. #45.)  Specifically, Plaintiff argues that she has the right to payment of her claim, and that LINA discriminated against her by requiring her to sign its form settlement agreement.  *Id.* at 13:7-12.

Defendants contend that Plaintiff cannot make out a claim for discrimination because she had no right to a monetary settlement based upon her disputed benefit claim.  (Defs.' Mot. 22:23-25, Dkt. #40.)  Defendants argue that Plaintiff had no right under the Plan or ERISA to settle the instant lawsuit, nor has she a right or entitlement to benefits.  *Id.* at 23:7-14.

29 U.S.C. § 1140 provides, in pertinent part, that "[i]t shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for

**UNITED STATES DISTRICT COURT**
For the Northern District of California

exercising any right to which he is entitled under the provisions of an employee benefit plan [or] this subchapter" or "for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan [or] this subchapter . . . ." It is well settled that "[t]o qualify for relief under section 1140, the participant or beneficiary must show that he was exercising a right to which he is entitled or to which he may become entitled." *West v. Greyhound Corp.*, 813 F.2d 951, 954 (9th Cir. 1987) (internal quotations omitted).

Here, the undersigned agrees with Defendants. Viewing the facts in the light most favorable to Plaintiff, the undersigned finds that Plaintiff has failed to present any evidence which would show that she had a right to settlement or payment of her claim or that LINA discriminated against her.

Accordingly, the undersigned finds that Plaintiff's breach of fiduciary duty claim is legally defective as LINA was not acting as a fiduciary to the Plan during settlement negotiations with Plaintiff, the claim is based on inadmissible settlement negotiations, and Plaintiff was not exercising a right to which she was entitled. Thus, the undersigned RECOMMENDS that the District Court GRANT summary judgment in favor of Defendants on Plaintiff's breach of fiduciary duty claim. Based on this finding, the undersigned also RECOMMENDS that the District Court DENY AS MOOT Plaintiff's motion for judgment on her breach of fiduciary duty claim as moot (Dkt. #77).

### V. CONCLUSION

Based on the foregoing, the undersigned finds that LINA did not abuse its discretion in denying Plaintiff's claim for LTD benefits. The undersigned also finds that Plaintiff is not entitled to damages or to a jury trial on her breach of fiduciary duty claim, and that her claim for breach of fiduciary duty is legally defective. Thus, the undersigned RECOMMENDS that the District Court:

1)    GRANT Defendants' motion to strike (Dkt. #28);

2)    GRANT Defendants' motion for summary judgment (Dkt. #40);

3)    DENY Plaintiff's cross-motion for judgment (Dkt. #43); and

4)    DENY Plaintiff's motion for judgment on her breach of fiduciary duty claim (Dkt. #77).

///

///

61

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b)(2), a party may serve and file objections to this Report and Recommendation 14 days after being served.

**IT IS SO RECOMMENDED.**

Dated: September 7, 2010

_____
Maria-Elena James
Chief United States Magistrate Judge

UNITED STATES DISTRICT COURT
For the Northern District of California

62